UNITED STATES of America,
Plaintiff,

v.

Dominick MANZO, et al., Defendants/Counterclaimants,
Third–Party Plaintiffs,

v.

Monsanto Company, et al., Third–Party Defendants.

No. CIV. A. 97–289(MLC).

United States District Court,
D. New Jersey.

Filed Dec. 29, 2000.

As Amended Aug. 16, 2001.

Lois J. Schiffer, Kenneth G. Long, U.S. Department of Justice, Environmental & Natural Resources Division, Environmental Enforcement Section, Washington, DC, Robert J. Cleary, Irene E. Dowdy, United States Attorney's Office, Trenton, NJ, Amelia Wagner, U.S. Environmental Protection Agency, New York City, for plaintiff.

Lee W. Shelly, Manasquan, NJ, for defendants/counterclaimants/third-party plaintiffs.

James E. Tyrrell, Jr., Robert A. Magnanini, Scott Louis Weber, D. Marsh Prause, Latham & Watkins, Esquires, Newark, NJ, for Monsanto Company.

Alan S. Golub, Dwyer, Kinburn & Hall, PC, Totowa, NJ, for Champion Chemical Company.

## MEMORANDUM OPINION

COOPER, District Judge.

This consolidated matter comes before the Court on the motion of plaintiff United States of America (the "United States") for partial summary judgment and to strike certain affirmative defenses; the cross-motion of defendants/ counterclaimants/third-party plaintiffs Dominick Manzo, Carmella Manzo, and Ace–Manzo, Inc. (collectively "Defendants"); and the motion of third-party-defendant Monsanto Company ("Monsanto") for dismissal of Defendants' third-party complaint and sanctions.

### BACKGROUND

The United States initiated this action against Defendants under section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). (Compl.¶ 1.) In its Complaint, the United States seeks to recover from Defendants response costs that it has incurred in responding to alleged release or threatened release of hazardous substances at the Burnt Fly Bog Superfund Site located on sixty acres of land in the Townships of Marlboro and Old Bridge, New Jersey (the "Site"). (Id. ¶¶ 1, 7.)

Dominick and Carmella Manzo, who are husband and wife (collectively the "Manzos"), own three parcels of land on or near the Site. (Decl. of Kenneth G. Long dated

2–3–00 ("Long Decl.") Ex. K: Decl. of Thomas Porucznik, EPA Remedial Project Manager, dated 2–3–00 ("Porucznik Decl.") at ¶¶ 5–6, Ex E: Dep. of Dominick Manzo dated 3–24–99 ("1999 Dominick Manzo Dep.") at 15, 27–28, 80–82, Ex F: Dep. of Carmella Manzo dated 3–24–99 ("1999 Carmella Manzo Dep.") at 7–9, 13; Ex J: Tax Sale Certificate for Lot 43 ("Lot 43 Tax Sale Certificate"); Defs.' Br. in Opp'n to Pl.'s Mot. for Summ. J. & in Supp. of Defs.' Counter Mot. for Summ. J. ("Defs.' Br.") at 2.) The Manzos purchased the parcels during the 1960s. (*See, e.g.,* Long Decl. Ex C: Deed dated 7–23–68 for Lot 6 ("Lot 6 Deed"), Deed dated 12–16–62 for Lot 6A ("Lot 6A Deed"), Deed dated 6–65 for Lot 43 ("Lot 43 Deed"); 1999 Dominick Manzo Dep. at 13, 21, 27; 1999 Carmella Manzo Dep. at 7–9.) The Manzos acquired the first parcel, formerly identified as Block 38, Lot 6A (the "landfill parcel" or "Lot 6A"), in 1963. (Lot 6A Deed; 1999 Dominick Manzo Dep. at 13–18, 26–27; 1999 Carmella Manzo Dep. at 7–8.) The landfill parcel had been used as a landfill prior to the Manzos' purchase, and the Manzos thereafter attempted to use it as a landfill until the issuance of a zoning injunction against this use in 1969. (*See, e.g.,* 1999 Dominick Manzo Dep. at 51–55; 1999 Carmella Manzo Dep. at 13–18; 26–27; Defs.' Br. at 2.) The Manzos acquired the second parcel, formerly identified as Lot 43 (the "Eagle parcel" or "Lot 43"), in 1965. (*See, e.g.,* Lot 43 Deed; 1999 Dominick Manzo Dep. at 16–21; 1999 Carmella Manzo Dep. at 8–9; Defs.' Br. at 2.) The

Eagle parcel adjoined the landfill parcel and was used by Champion Chemical Company, Inc. ("Champion")[1] and Eagle Asphalt, Inc. ("Eagle") from the early 1950s until approximately 1963 for storage and disposal of waste oil, used filter clay, and sludge. (*See, e.g.,* Long Decl. Ex B: Defs.' Response to Interrog. ("Defs.' Response") §§ 6, 16, Ex. G: Dep. of Martin Eckel dated 8–7–80 ("Eckel Dep.") at 3–17; Defs.' Br. at 2–3.) These materials were initially disposed of in waste oil lagoons (the "Lagoons"), a sludge pile, and in drums discarded at the Site. (*See, e.g.,* Porucznik Decl. ¶ 10; Defs.' Response ¶¶ 6, 16; Defs.' Br. at 3.) Lot 43 was later sold to Marlboro Township at a tax sale conducted because of the Manzos' failure to pay real estate taxes, but it appears that the Manzos retain their right of redemption. (*See, e.g.,* Lot 43 Tax Sale Certificate; 1999 Dominick Manzo Dep. at 15, 27–28, 80–82; 1999 Carmella Manzo Dep. at 8–9.) In 1968, the Manzos purchased the third parcel, formerly known as Block 38, Lot 6 (the "boarding home parcel" or "Lot 6"), on which was and remains situated a boarding home. (Lot 6 Deed; 1999 Dominick Manzo Dep. at 15, 27; 1999 Carmella Manzo Dep. at 13; Defs.' Br. at 2.)

When the Manzos acquired title to the Eagle parcel, Dominick Manzo knew that the Lagoons contained waste oil and sludge from the operations of Eagle and Champion. (*See, e.g.,* 1980 Dominick Manzo Dep. at 71–72; Defs.' Br. at 4–5.) At the time of purchase, the walls surrounding the Lagoons were intact. (*See, e.g.,*

---

**1.** Champion is a third-party defendant in this action. Although not a party to these motions, Champion has submitted a certification in response to the United States' motion for partial summary judgment. (*See* Certif. of Alan S. Golub, Esq. filed 5–10–00.) In the certification, Champion objects to any and all statements made by the United States, or any other party in the context of the United States' motion, concerning Champions' al-

leged activities, operations, responsibility, and liability for contamination at the Site, and reserves the right to challenge these statements if it is unable to reach a settlement that resolves its liability, if any, in this matter. (*Id.* ¶ 7.) We note Champion's objection. Any statements of fact contained in this opinion will not be binding upon Champion in this matter.

1980 Dominick Manzo Dep. at 79, 128.) In addition, the walls had valved pipes through them, which valves allowed excess water to drain from the Lagoons. (*Id.* at 95–96.) Dominick Manzo also knew at that time that there were many old reused drums filled with oil and tar scattered around the Eagle parcel. (*See, e.g., id.* at 70, 83–85; Defs.' Br. at 4–5.) Some of these drums were open with the oily contents spilling out. (*See, e.g.,* 1980 Dominick Manzo Dep. at 85.)

After the Manzos acquired the Eagle parcel, Dominick Manzo and employees of Ace–Manzo, Inc. ("Ace–Manzo")[2] broke through and leveled the walls surrounding four of the Lagoons after mixing the contents with sand and gravel. (1980 Dominick Manzo Dep. at 78–80, 127–130; Defs.' Br. at 5.) Dominick Manzo and employees of Ace–Manzo used some of the oily mixed material from the leveled Lagoons to build a road from the Eagle parcel to the part of the landfill parcel being used as a landfill. (1980 Dominick Manzo Dep. at 80–81; Defs.' Br. at 5.) Dominick Manzo and employees of Ace–Manzo also spread some of the oily mixed material from the leveled Lagoons as cover on top of the landfill that the Manzos operated on the landfill parcel. (1980 Dominick Manzo Dep. at 81–82, 129–30; Defs.' Br. at 5.) Dominick Manzo and employees of Ace–Manzo also moved some of the oil and tar filled drums, possibly with a bulldozer, during the excavation, and some of the drums may have been punctured during this movement. (1980 Dominick Manzo Dep. at 127–28.) Ace–Manzo also placed creosote on Lot 43. (Decl. of Dominick Manzo dated 3–21–00 ("Manzo Decl.") ¶ 3; Decl. of Lee W. Shelly, Esq. dated 3–22–00 ("Shelly Decl.") Ex. C: Dep. of Dominick Manzo dated 8–7–80

at 123.) This creosote, however, was in the form of logs or telephone poles, and Defendants claim that it was never identified or listed as a hazardous substance and was never released into the environment and does not pose a threat of such a release. (Manzo Decl. ¶ 3; Shelly Decl. Ex. H: Monmouth County Department of Health Continuation Sheet ("Monmouth County Health Continuation Sheet"); Defs.' Br. at 11.)

In 1979, Dominick Manzo observed water or liquid escaping from one of the remaining Lagoons through a breach in the wall and flowing down to the boarding home parcel, although he claims that the liquid did not contain any sludge. (1980 Dominick Manzo Dep. at 100–02, 104–05.) Dominick Manzo made no attempt to repair the breach. (*Id.* at 104–05.)

Beginning in 1979, the United States Environmental Protection Agency ("EPA") and the New Jersey Department of Environmental Protection ("NJDEP") conducted investigations of the Site. (Porucznik Decl. ¶ 11; Defs.' Br. at 6.) These investigations revealed hazardous substances, including but not limited to polychlorinated bi-phenyls ("PCBs"), lead, methylene chloride, trichloroethylene, chloroform, and benzene at the Site. (*See, e.g.,* Porucznik Decl. Ex. 4: Record of Decision ("ROD1"); Porucznik Decl. ¶ 17.) EPA issued General Notice letters to Defendants on February 8, 1982, informing Defendants of their potential liability under section 107 of CERCLA, 42 U.S.C. § 9607, for contamination at the Site. (*See, e.g.,* Porucznik Decl. ¶ 14.) EPA placed the Site on the National Priorities List on September 1, 1983. (*Id.* ¶ 13.)

---

**2.** Ace–Manzo is a New Jersey corporation engaged in sewer construction. (Defs.' Br. at 5.) The Manzos are the sole corporate officers, stockholders, and directors of Ace–Man-

zo. (*Id.; see also, e.g.,* 1980 Dominick Manzo Dep. at 57.) Dominick Manzo was the person responsible for managing the activities of Ace–Manzo. (Defs.' Response at 3.)

EPA and the State of New Jersey entered into a cooperative agreement, pursuant to section 104(d) of CERCLA, which provided Superfund monies to NJDEP for work at the Site. (*Id.* ¶ 15.) Under this cooperative agreement, NJDEP was assigned responsibility as the lead agency for the Site and EPA was assigned responsibility as the support agency for the Site. (*Id.*) EPA and NJDEP have coordinated response actions at the Site. (*Id.*) It appears that spills occurred during the cleanup process. (Manzo Decl. Ex A: Letter from Lee W. Shelly, Esq. to Lawrence G. Moncher, Esq. dated 12–23–81 ("12–23–81 Moncher Letter"), Ex B: Letter from Lee W. Shelly, Esq. to Lawrence G. Moncher, Esq. dated 3–30–82 ("3–30–82 Moncher Letter"); Decl. of Lee W. Shelly, Esq. dated 3–22–00 Ex. K: Burnt Fly Bog Site Report ("Burnt Fly Bog Site Report").)

The agencies divided the Site into different areas or sections. The Site was divided into: (1) the Uplands Area, (2) the Tar Patch Area, (3) the Contaminated Soils Area, (4) the Northerly Wetlands, (5) the Westerly Wetlands, (6) the Downstream Area. (*Id.* at ¶ 7; Porucznik Decl. Ex. 2: Site Map ("Site Map").) The Uplands Area, the Tar Patch Area, and the Northerly Wetlands Area are located on Lots 6A, 6, and 43. (Porucznik Decl. ¶ 9.) It appears from the Site Map that the Contaminated Soils Area is located, at least in part, on Lot 6A. (Site Map.)[3] It also appears that the Westerly Wetlands and the Downstream Area are not owned by the Manzos. (Site Map; Defs.' Br. at 10.) The Uplands Area includes the Lagoons, sludge pile, and drums. (Porucznik Decl. ¶ 7.) EPA and NJDEP investigations revealed extensive PCB and lead contamination in the Uplands Area, including the Lagoons. (Porucznik Decl. ¶ 17.) The Westerly Wetlands, Downstream Area, Tar Patch Area, and Northerly Wetlands are down gradient from the Uplands Area, and NJDEP and EPA investigations have found that the contamination in these areas is the result of uncontrolled runoff and discharges from the Uplands Area. (*Id.*) The Manzos' landfill, located on the landfill parcel, is not a part of the Site. (Manzo Decl. ¶ 2; Pl.'s Mem. in Reply to Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J. & in Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pl.'s Reply Br.") at 35.)

EPA and NJDEP have divided the Site remediation into three separate operable units. (*See, e.g.,* Porucznik Decl. ¶ 16) A separate record of decision ("ROD"), which documents EPA's selection of a remedial action, has been issued by EPA for each operable unit. (*Id.*)

On November 16, 1983, EPA issued Record of Decision 1 ("ROD1") for Operable Unit 1 ("OU1"), which selected a remedy to address the contamination in the Uplands Area, Tar Patch Area, Northerly Wetlands, and the Contaminated Soils Area. (*Id.* ¶ 50; ROD1 at 500001–02.) The remedy selected for OU1 included the following response actions: (1) excavating and disposing of hazardous substances in the Lagoons, the sludge pile area, the Tar Patch Area, and the drummed waste area; (2) excavating and disposing of hazardous substances in the Northerly Wetlands and the Contaminated Soils Area; (3) restoring the original Site contours and replanting the excavated areas; and (4) studying the

---

**3.** The Court notes that in the final ROD, the reference to the Tar Patch Area included the Contaminated Soils Area as well. (Porucznik Decl. ¶ 25; Porucznik Decl. Ex. 6: Record of Decision 3 ("ROD3")).

The Court further observes that the actual relationship between these Site areas and the lots or parcels owned by the Manzos is unclear. For instance, although the Uplands Area is certainly on Lot 43, it is unclear whether portions of this Uplands Area are also on other lots as well.

Westerly Wetlands further to determine the extent of contamination in this area. (*Id.* ¶ 50; ROD1 at 500001–02.)

Between 1985 and 1990, NJDEP conducted remedial actions in accordance with ROD1, including removal of the asphalt pile, removal of lagoon liquids, excavation and off-site disposal of approximately 85,000 tons of contaminated soil, and installation of a clay cap over the former lagoon area. (Porucznik Decl. ¶ 17.) About 600 cubic yards of PCB-contaminated soil was removed in 1992 for off-site incineration. (*Id.*)

During the performance of OU1, NJDEP and EPA determined that the Northerly Wetlands and Contaminated Soils Area should be remediated along with the Westerly Wetlands in a later operable unit because of their similar topographical and hydrogeological characteristics. (*Id.* ¶ 52; Porucznik Decl. Ex. 5: Record of Decision 2 ("ROD2") at 500010.) NJDEP contracted for the performance of a supplemental remedial investigation/feasibility study for the Westerly Wetlands and the Downstream Area, which was completed in 1983. (Porucznik Decl. Ex. ¶ 19; ROD2 at 500011.) This investigation confirmed the presence of high concentrations of lead and PCBs in the soils of the Westerly Wetlands and the Downstream Area. (Porucznik Decl. ¶ 21; ROD2 at 500012–14)

On September 29, 1988, EPA issued Record of Decision 2 ("ROD2") for Operable Unit 2 ("OU2"), which was to be an "Interim Remedy" for the Westerly Wetlands and Downstream Area. (Porucznik Decl. ¶ 20.) OU2 included the following response actions: (1) excavating and disposing of contaminated soil in the Downstream Area; (2) containing the contaminated soil in the Westerly Wetlands by means of a sedimentation basin and appropriate diversion controls to prevent further migration; (3) building security fencing

and an access road in the Westerly Wetlands; and (4) conducting a study on treatment alternatives for the Westerly Wetlands, the Northerly Wetlands, and the Contaminated Soils Area. (*Id.* ¶ 22; ROD2 at 500002.)

Construction of the security fencing along Spring Valley Road began on January 15, 1991 and was completed on February 15, 1991. (Porucznik Decl. ¶ 23.) NJDEP hired a contractor in August 1992 to perform the remedial design for the removal of the contaminated soil in the Downstream Area and for construction of the sedimentation basin. (*Id.*) As part of the design investigation, the contractor also delineated the Tar Patch Area. (*Id.*) This remedial design was completed by May 1994. (Porucznik Decl. Ex. 6: Record of Decision 3 ("ROD3") at 5.) Removal of the contaminated soil in the Downstream Area and construction of the sedimentation basin commenced on November 7, 1995, and the work was completed by the end of 1996. (*Id.*)

EPA performed an ecological assessment of the Westerly Wetlands based on the results of a field study conducted in 1991. (*Id.* ¶ 24.) In 1993, NJDEP hired a contractor to perform a separate feasibility study of the remaining contaminated areas: the Westerly Wetlands, Northerly Wetlands, and Tar Patch Area. (*Id.*) NJDEP performed soil sampling in the Northerly Wetlands in 1995 and in the Westerly Wetlands in 1996 to delineate, and then confirm, the level of contamination in these portions of the Site. (*Id.*)

On September 30, 1998, EPA issued Record of Decision 3 ("ROD3") for Operable Unit 3 ("OU3"), which selected a remedy for the contamination in the Westerly Wetlands, the Northerly Wetlands, and the Tar Patch Area, previously known as the Tar Patch and Contaminated Soils Area. (*Id.* ¶ 25; ROD3 at 34–37.) The

major components of OU3 include: excavation and off-site disposal of contaminated soil from the Northerly Wetlands and the Tar Patch Area; backfilling of the excavated areas and reestablishing or creating wetlands; security fencing around the Westerly Wetlands; recording a Deed Notice for the Westerly Wetlands, Northerly Wetlands, and Tar Patch Area; and monitoring of the Westerly Wetlands, Downstream Area, and Burnt Fly Brook. (Porucznik Decl. ¶ 25; ROD3 at 34–37.) NJDEP is currently in the process of selecting a remedial design contractor for OU3. (Porucznik Decl. ¶ 26.)

The United States has incurred at least $8 million of response costs in connection with OU2 and OU3 response actions at the Site through December 1999, including the costs it has paid the State of New Jersey through the cooperative agreement with NJDEP. (*Id.* ¶ 27; Long Decl. Ex. I: Decl. of Jo-Ann Velez, EPA Financial Systems Specialist, dated 3–25–99 ("Velez Decl.") ¶ 9.) The United States expects to incur significantly more costs in the future for OU3. (Pls.' Br. at 13.)

### RELEVANT PROCEDURAL HISTORY

The United States filed this action against Defendants on January 14, 1997. On April 1, 1997, the Defendants filed cross claims and a third-party Complaint for contribution against numerous other parties, including Monsanto. The Defendants' original third-party Complaint alleged, among other things, that the manufacturing of PCBs and products containing PCBs constituted an abnormally dangerous activity and that Monsanto, General Electric, and Westinghouse were strictly liable to Defendants. In response, Monsanto, General Electric, and Westinghouse filed a joint motion to dismiss the third-party Complaint as to them for failure to state a claim upon which relief could be granted. Defendants filed a cross-motion to amend their third-party Complaint to

allege liability against Monsanto, General Electric, and Westinghouse for "CERCLA Arranger Liability" (42 U.S.C. § 9607(a)(3)) and "Restitution/Unjust Enrichment." The Court dismissed the third-party Complaint against Monsanto, General Electric, and Westinghouse and denied the Defendants' cross-motion as being futile on April 24, 1998. Defendants' motions for reconsideration of, and for certification to appeal, the Court's April 24, 1998 decision were both denied.

Defendants then filed a motion for leave to file an amended complaint against Monsanto for strict product liability and negligence for the manufacture and sale of PCBs. Monsanto opposed the motion. The magistrate judge denied Defendants' motion, finding that (1) the statute of limitations for a direct claim had expired, and (2) any indirect claims against Monsanto based on contribution or indemnification were futile because Monsanto and Defendants were not joint tortfeasors. Defendants' motion for reconsideration, and appeal to this Court, were both denied.

The Court bifurcated this action into separate liability and damages phases. Discovery on liability issues ended in 1999. Discovery on damages, including the amount of recoverable response costs, has not yet begun.

On April 12, 1999, the State of New Jersey, on behalf of NJDEP, filed a separate action against Defendants in the Superior Court of New Jersey (the "State Court") to recover its response costs at the Site pursuant to the New Jersey Spill Compensation and Control Act (the "Spill Act"), 58 N.J. Stat. Ann. § 10–23.11 *et seq.* Defendants impleaded numerous third-party defendants in that action. Among other things, Defendants' third-party Complaint seeks contribution and indemnification from Monsanto based on strict product liability and negligence for the

manufacture and sale of PCBs, and that it is involved in the waste oil business, an allegedly abnormally dangerous activity.[4] On August 19, 1999, the State Court action was removed to this Court, and was subsequently consolidated with this case.

Before us now are five motions: (1) the United States' motion for partial summary judgment against Defendants seeking to establish Defendants' liability under Section 107 of CERCLA, (2) the United States' motion to strike the affirmative defenses raised by Defendants, (3) the cross-motion for summary judgment by Defendants against the United States seeking dismissal of the United States' Complaint,[5] (4) Monsanto's motion to strike Defendants' third-party Complaint as to it for failure to state a claim upon which relief can be granted, and (5) Monsanto's motion for sanctions.

## DISCUSSION

### I. Standards of Review

#### A. Motion for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, the non-moving party must present evidence that establishes that a genuine issue of material fact exists, making it necessary to resolve the difference at trial. *Id.* at 324, 106 S.Ct. 2548; *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985). A non-moving party may not rely on mere allegations; it must present actual evidence that creates a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The role of the judge at the summary judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. "By its very terms, the standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

---

4. In Count Four of the third-party Complaint, Defendants seek damages from Monsanto on the basis that it is involved in the waste oil business, an allegedly abnormally dangerous activity. Monsanto appears to have been inadvertently included as a defendant in this count because Defendants offered no factual support for this claim in their Complaint. In addition, Defendants appear to have abandoned this claim in response to Monsanto's motion to dismiss because they do not defend Monsanto's motion as to this claim. Therefore, the Court will dismiss Count Four of the third-party complaint as to Monsanto.

5. The actual grounds of Defendants' motion for summary judgment are unclear. The Defendants' initial brief appears to request summary judgment based on the statute of limitations defense and the allegedly unconstitutional retroactivity of CERCLA. (Defs.' Br. at 16.) For the sake of completeness, however, the Court will treat Defendants' cross-motion as seeking summary judgment on each issue raised in this Memorandum Opinion.

is that there be no genuine issue of material fact." *Id.* at 247–48, 106 S.Ct. 2505. Material facts are only those facts that might affect the outcome of the action under governing law. *Id.* at 248, 106 S.Ct. 2505; *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citation omitted).[6]

### B. *Motion to Dismiss Complaint*

A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) "only if, accepting all alleged facts as true, the plaintiff is not entitled to relief." *Bartholomew v. Fischl,* 782 F.2d 1148, 1152 (3d Cir.1986) (citations omitted). Further, all reasonable inferences that can be drawn from the plaintiff's allegations "must be accepted as true and viewed in the light most favorable to the non-moving party." *Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987) (citations omitted). This Court may not dismiss a complaint unless the plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct.

99, 2 L.Ed.2d 80 (1957). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

### II. *The Motions of the United States and Defendants*

The United States appears to make out its *prima facie* case for the recovery of response costs related to OU2 and OU3 from the Defendants pursuant to section 107(a) of CERCLA. Section 107(a) of CERCLA provides in relevant part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances

---

**6.** The United States makes a motion to strike Defendants' affirmative defenses under Federal Rule of Civil Procedure 12(f) for legal insufficiency. Although courts are divided on the issue, *see, e.g., Krauss v. Keibler–Thompson Corp.,* 72 F.R.D. 615, 616–17 (D.Del.1976) (refusing to consider insufficiency of defense under summary judgment standard), case law does support the treatment of the question of the sufficiency of a defense under a partial summary judgment framework, *see, e.g., Hoglund v. DaimlerChrysler Corp.,* No. 99–84–P–H, 2000 WL 760958, at *3 (Apr. 25, 2000) (Cohen, U.S.M.J.), *rejected on other grounds,* 102 F.Supp.2d 30 (D.Me.2000); *Brosnan v. Provident Life & Accident Ins. Co.,* No. CIV. A. 96–4605, 1999 WL 165684, at *1 n. 1 (Mar.

11, 1999) (treating untimely motion to strike as motion for summary judgment); *Marco Holding Co. v. Lear Siegler, Inc.,* 606 F.Supp. 204, 213 (N.D.Ill.1985) (noting that courts convert motions to strike into summary judgment motions). Because both parties refer to matters outside the pleadings and for the sake of consistency and clarity, the Court will generally treat the motion to strike as a motion for summary judgment. It will therefore dismiss the motion to strike as moot as to all affirmative defenses except Affirmative Defense 4 for failure to state a claim. (Answer Affirmative Defense 4.) The Court will grant the motion to strike as to Affirmative Defense 4.

owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

CERCLA § 107(a), 42 U.S.C. § 9607(a).

■ The United States argues that it has satisfied the requirements of section 107(a): (1) the site is a facility at which hazardous substances have come to be located; (2) a release or threatened release of these hazardous substances has occurred; (3) the release or threatened release has required or will require the United States to incur response costs; and (4) the particular defendant falls under the categories of persons liable under the provision. *Id.; see also New Jersey Tpk. Auth. v. PPG Indus.*, 197 F.3d 96, 103 (3d Cir.1999); *United States v. CDMG Realty Co.*, 96 F.3d 706, 712 (3d Cir.1996). A defendant is jointly and severally liable under this statute, absent proof by the defendant of divisibility. *See, e.g., PPG Indus.*, 197 F.3d at 104; *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1121 (3d Cir.1997).

The Court finds that the United States has established its *prima facie* case for Defendants' joint and several liability for the response costs incurred or to be incurred in connection with OU2 and OU3. It has sufficiently demonstrated the absence of a genuine issue of material fact as to each element of its *prima facie* claim. Defendants generally do not contest the United States' demonstration of a *prima facie* case, except perhaps for arguments they make regarding the divisibility and innocent landowner defenses. (Defs.' Br. at 9–12.) Even considering these contentions, the Court concludes that the Defendants have not presented evidence sufficient to create a genuine issue of material fact preventing the entry of partial summary judgment in favor of the United States.

■ The United States has sufficiently established that the Site is a facility under CERCLA. CERCLA defines a "facility" as:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

CERCLA § 101(9), 42 U.S.C. § 9601(9). EPA and NJDEP investigations revealed hazardous substances, including but not limited to polychlorinated bi-phenyls ("PCBs"), lead, methylene chloride, trichloroethylene, chloroform, and benzene at the Site. (*See, e.g.,* ROD1; Porucznik Decl. ¶ 17.) Defendants appear to admit that the Site is contaminated. (Def.'s Br. at 6.) Even if the creosote materials are not hazardous substances (Manzo Decl. ¶ 3; Monmouth County Health Continuation Sheet; Defs.' Br. at 11.), sufficient uncontested evidence establishes the presence of hazardous materials on the Site to satisfy the "facility" requirement of CERCLA.

No genuine issue of material fact exists as to the second element of release or threatened release of a hazardous substance. Section 101(22) of CERCLA defines the term "release" very broadly as:

any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)....

CERCLA § 101(22), 42 U.S.C. § 9601(22). EPA and NJDEP found the presence of PCBs, lead, and other hazardous substances at the Site. (ROD1; Porucznik Decl. ¶ 17.) The agencies also concluded that these substances migrated from the Uplands Area. (Porucznik Decl. ¶ 17.) As discussed above, the presence of these substances satisfies this element, even if the creosote is not a hazardous substance or there was no release or threatened release of the creosote. (Manzo Decl. ¶ 3; Monmouth County Health Continuation Sheet; Defs.' Br. at 11.) The Court finds that the United States has satisfied its summary judgment burden as to this element of liability, a showing that Defendants have failed to challenge adequately.

■ The United States also has satisfied its burden of demonstrating that it has incurred response costs in connection with the Site. CERCLA defines response as "remove, removal, remedy, and remedial action ... including enforcement activities related thereto." CERCLA § 101(25), 42 U.S.C. § 9601(25). The United States has incurred at least $8 million in response costs for its response actions in connection with the OU2 and OU3 stages of the remediation. (Porucznik Decl. ¶ 27; Velez Decl. ¶ 9.) Defendants do not expressly raise this element in their briefs. It appears that the particular amount of recovery costs is not determined at the liability

stage of analysis. *United States v. Kramer*, 757 F.Supp. 397, 436 (D.N.J.1991). In any case, it is Defendants' burden to present evidence for why certain costs are inconsistent with the National Contingency Plan ("NCP"), *United States v. Rohm & Haas Co.*, 939 F.Supp. 1142, 1150 (D.N.J. 1996); *but see, e.g., Redwing Carriers v. Saraland Apartments*, 94 F.3d 1489, 1496 n. 8 (11th Cir.1996) (indicating split on whether plaintiff must demonstrate compliance with NCP at liability stage), which is a plan promulgated by EPA governing its removal and remedial activities, 42 U.S.C. § 9604(a)(1); 40 C.F.R. § 300 *et seq.* Defendants have not done so.

■ The final element, status as a liable party, does present a more difficult question for the Court, particularly regarding the liability of Ace–Manzo. The status of the Manzos, however, is clear given their ownership of a portion of the Site. Section 107(a)(1) of CERLCA imposes liability on current owners of a site even if the disposal of the substances occurred before the commencement of ownership and the owner has not been shown to have caused a release. *See, e.g., New York v. Shore Realty Corp.*, 759 F.2d 1032, 1042–44 (2d Cir.1985); *Rohm & Haas Co.*, 939 F.Supp. at 1152. The United States clearly establishes that Dominick Manzo and Carmella Manzo own, for purposes of CERCLA, Lots 6, 6A, and 43. (Porucznik Decl. at ¶¶ 5–6; 1999 Dominick Manzo Dep. at 15, 27–28, 80–82; 1999 Carmella Manzo Dep. at 7–9, 13; Lot 43 Tax Sale Certificate; Defs.' Br. at 2.) The Uplands Area, Tar Patch Area, and Northerly Wetlands Area are located on these lots. (Porucznik Decl. ¶ 9.) The fact that Lot 43 was the subject of a tax sale (*see, e.g.,* Lot 43 Tax Sales Certificate; 1999 Dominick Manzo Dep. at 15, 27–28, 80–82; 1999 Carmella Manzo Dep. at 8–9) does not strip the Manzos of their ownership status for

purposes of CERCLA because section 101(20)(A) defines the term "owner" to include, "in the case of any facility, title or control of which was conveyed due to bankruptcy, foreclosure, tax delinquency, abandonment or similar means to the unit of a State or local government, any person who owned, operated, or otherwise controlled activities at such facility immediately beforehand." CERCLA § 101(20)(A), 42 U.S.C. § 9601(20)(A). In any case, Defendants do not raise this tax sale issue or otherwise address the question of ownership besides emphasizing that the landfill parcel is not located on the Site and that the Manzos do not own the entire Site. (Defs.' Br. at 9–11.) The fact that the Manzos do not own the entire Site does not affect their liability under this element, although it may be relevant to a divisibility argument. *United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1279–80 (3d Cir. 1993).

When we turn to the status of Ace–Manzo, the analysis becomes more complicated, partly because Defendants possibly, if unintentionally, raise a number of arguments concerning its status. The United States argues that Ace–Manzo is liable as either an operator under section 107(a)(2) or as a transporter under section 107(a)(4). (Pls.' Br. at 26–27.) The Court finds that the United States has established that no genuine issues of material fact exist as to Ace–Manzo's status as a liable party.

■ Section 107(a)(4) provides that "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance" is a liable party. CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4). A corporation, as well as other organizations such as commercial entities and firms, may be liable as

a transporter. 42 U.S.C. § 9601(21) (defining "person"); *see also United States v. USX Corp.*, 68 F.3d 811, 820–24 (3d Cir. 1995). A party may be liable as a transporter even if the material remains on the Site. *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342–43 (9th Cir.1992) ("Whether a transporter moves hazardous material from one parcel of land to another, or whether he simply takes the material from a contaminated area on one parcel and disposes of it on an uncontaminated area of the same parcel, he has spread contamination.")

■ The United States establishes that there is no genuine issue of material fact regarding Ace–Manzo's status as a transporter. Defendants, in their response to interrogatories, admit that Ace–Manzo performed earth-moving activities at the Site between 1964 and 1969. (Defs.' Response ¶ 3.) In the words of Defendants' initial brief, "Ace–Manzo, Inc. excavated several of the lagoons after mixing the contents with sand and gravel to stabilize and solidify the liquid contents of the lagoon." (Defs.' Br. at 5.) The mixture was then used to construct a road from the landfill to Lot 43, as well as to cover the landfill itself. (1980 Dominick Manzo Dep. at 81–82, 129–30.) Defendants admit that this activity occurred (Defs.' Br. at 5), but they emphasize that the landfill is not a part of the Site (Defs.' Br. at 10), a claim that the United States itself acknowledges as true (Pl.'s Reply Br. at 35). This, however, does not alter the finding that a road was built through the Site because Lot 43 itself is part of the Site. (Porucznik Decl. ¶ 9.) This movement and use of the mixture involved active human conduct and certainly exceeds the mere "passive migration" found not to constitute "disposal." *CDMG Realty Co.*, 96 F.3d at 713–14. It also appears that the drums located on Site were moved as well (1980 Dominick

Manzo Dep. at 127–28),[7] a fact possibly admitted by Defendants in their initial brief. (Defs.' Br. at 10 ("Admittedly, Ace–Manzo's activities at the site moved the contaminants....").) Defendants argue that its activities did not increase the amount of contamination or spread it to uncontaminated areas. (Defs.' Br. at 10.) Although the Ninth Circuit in *Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp.*, 976 F.2d 1338 (9th Cir. 1992), emphasized that the movement at issue was to an uncontaminated part of the site, *id.* at 1342–43, this Court rejects Defendants' possible argument that this fact constitutes a prerequisite for transporter liability.[8]

Because the United States has established the four elements of *prima facie* liability, the Court will grant its partial summary judgment motion as to Defendants' liability for response costs incurred or to be incurred in connection with OU2 and OU3, subject to the divisibility defense discussed below. The Court will therefore proceed to a discussion of Defendants' affirmative defenses.

## A. *The Statute of Limitations*

The most difficult question presented is how to apply the statute of limitations provisions for cost recovery actions under CERCLA in the context of multiple RODs and operable units. Defendants' Affirmative Defense 7 raises the statute of limitations question (Answer Affirmative Defense 7), and Defendants seek summary judgment on this basis. (Defs.' Br. at 7–8.) The United States contends that it is not barred by the statute of limitations from seeking recovery of costs related to OU2 and OU3, even though it does not assert that it can receive comparable compensation for costs arising out of OU1. We agree that the claims based on OU2 and OU3 are not time-barred under the statute, although there appears to be an absence of case law directly on this issue. We reach this conclusion based on the judicial presumptions favoring this remedial result, the administrative framework developed by EPA demonstrating the vital role played by operable units in the remediation process, and general policy considerations. Because the facts concerning the stages of the EPA's cleanup process are not in dispute, the Court grants the United States' motion for summary judgment as to the statute of limitations defense and therefore denies Defendants' cross-motion for summary judgment as to the same aspect of this case as moot.

Section 113(g)(2), added to CERCLA by the Superfund Amendments and Reorganization Act of 1986 ("SARA"), specifies that:

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced—

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery

7. The Court notes that the deposition testimony cited for this conclusion is less than clear because it appears that the drums may possibly have been moved accidentally while the work on the Lagoons was ongoing. (1980 Dominick Manzo Dep. at 127–28.) Because the building of the road is sufficient, the Court need not reach the issue of whether or not this movement constituted transportation for purposes of imposing CERCLA liability.

8. Because all Defendants have been found *prima facie* liable, the Court does not need to reach the United States' contention that the Manzos are liable as owners of the Site at the time of disposal of hazardous substances, that Dominick Manzo is liable as an operator of the Site at the time that hazardous substances were disposed, and that Ace–Manzo is liable as an operator as well. (Pl.'s Br. at 21–26.) Many of Defendants' contentions, such as the argument that only "passive migration" has occurred, which does not constitute disposal, seem to relate to these other bases of liability. (Defs.' Br. at 9–11.)

action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).[9]

▇▇▇ Given the absence of a clear indication in SARA as to whether the

---

9. CERCLA also defines both "removal" and "remedial." Section 101(23) defines "remove" or "removal" as:

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act.

CERCLA § 101(23), 42 U.S.C. § 9601(23). Similarly section 101(24) states:

The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

CERCLA § 101(24), 42 U.S.C. § 9601(24). These definitions obviously overlap. *See, e.g.,*

United States may recover remedial expenses incurred for operable units when any recovery for the initial operable unit would be time-barred, judicial presumptions traditionally applicable to the statute of limitations provision should be considered. *See Kelley v. E.I. DuPont de Nemours & Co.,* 17 F.3d 836, 842 (6th Cir.1994) (applying presumptions to CERCLA's statute of limitations because of statutory ambiguity). Numerous courts have emphasized that the statute of limitations is to be construed in favor of the United States to avoid hindering important public rights and policies. *See, e.g., United States v. Akzo Nobel Coatings, Inc.,* 990 F.Supp. 897, 904 (E.D.Mich.1998) (citing *Badaracco v. Commissioner,* 464 U.S. 386, 391–92, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984); *E.I. Dupont De Nemours & Co. v. Davis,* 264 U.S. 456, 44 S.Ct. 364, 68 L.Ed. 788 (1924)); *United States v. Chromatex, Inc.,* 832 F.Supp. 900, 902 (M.D.Pa.1993), *aff'd,* 39 F.3d 1171 (3d Cir.1994) (unpublished table opinion); *United States v. United Nuclear Corp.,* 814 F.Supp. 1552, 1561–62 (D.N.M.1992). *But see, e.g., United States v. Navistar Int'l Transp. Corp.,* 152 F.3d 702, 707 (7th Cir.1998) ("Therefore, although we shall construe ambiguities in the statute in favor of the government in an effort to avoid frustrating the beneficial purposes of CERCLA, we must recognize that Congress has determined that those beneficial purposes are serviced by the timely filing of recovery actions.")

*United States v. Akzo Nobel Coatings, Inc.,* 990 F.Supp. 897, 904 n. 16 (E.D.Mich.1998).

**10.** The provision provides in relevant part:

Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the na-

This viewpoint is consistent with the general principle that CERCLA, as a remedial statute, ought to be liberally construed in order to achieve its remedial purposes. *See, e.g., FMC Corp. v. Dep't of Commerce,* 29 F.3d 833, 840 (3d Cir.1994). The Court finds that these presumptions clearly favor the United States' position.

This conclusion is strengthened by the administrative framework established by EPA in order to conduct its environmental response actions. Under this administrative framework, the concept of operable units occupies a central role, demonstrating that the division of work into operable units should not be ignored by courts in determining whether the statute of limitations bars a claim. CERCLA requires EPA to undertake response actions consistent with the NCP. 42 U.S.C. § 9604.[10] Pursuant to this congressional directive, EPA has issued a series of NCPs, with the United States contending that the 1982, 1986, and 1990 NCPs governed EPA's activities at the Site.[11] (Pl.'s Reply Br. at 2 n. 2.) The United States' reply brief provides a more comprehensive examination of EPA's procedures and policies (*see id.* at 3–5), but for purposes of this case, it is sufficient to focus on RODs and operable units. An ROD is the official documentation of the final remedial decision. 40 C.F.R. §§ 300.430(f)(4)-(5) (2000). It appears that EPA is authorized to select multiple remedial actions for a site. CERCLA § 121(d), 42 U.S.C. § 9621(d).[12]

tional contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time....
42 U.S.C. § 9604(a)(1).

**11.** The Court's discussion will focus on the most recent NCP, apparently dating from 1994. 40 C.F.R. § 300 *et seq.* (2000).

**12.** This provision permits EPA to select a remedial action not in compliance with all le-

The House Conference Report accompanying the SARA legislation expressly referred to both RODs and multiple remedial actions when it stated that "[it] should be the practice of the President to set forth each separate and distinct phase of a response action in a separate Record of Decision document." H.R. Conf. Rep. No. 99–962 at 224 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 3317.

EPA has labeled these distinct phases of the entire remedy as operable units. The current NCP defines the term "operable unit" as:

Operable unit means a discrete action that comprises an incremental step toward comprehensively addressing site problems. This discrete portion of a remedial response manages migration, or eliminates or mitigates a release, threat of a release, or pathway of exposure. The cleanup of a site can be divided into a number of operable units, depending on the complexity of the problems associated with the site. Operable units may address geographical portions of a site, specific site problems, or initial phases of an action, or may consist of any set of actions performed over time or any actions that are concurrent but located in different parts of a site.

40 C.F.R. § 300.5 (2000).

Given the prominent role of the concept of operable units in the administrative framework governing the actual implementation of CERCLA, the Court cannot conclude that it is irrelevant for purposes of the statute of limitations whether EPA divided its task into different operable units. As the regulations adopted by an administrative agency, these specific provisions may be entitled to a certain degree of deference particularly because the statutory provision itself is ambiguous, even though they do not expressly interpret the statutory provision at issue. *See, e.g., Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (deferring to reasonable agency interpretation of ambiguous statute contained in legislative rule); *see also Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 1662–63, 146 L.Ed.2d 621 (2000) (finding that full *Chevron* deference does not apply when interpretation of statute is contained in opinion letter); *Madison v. Resources for Human Development, Inc.,* 233 F.3d 175, 185–87 (3d Cir.2000) (finding that informal agency interpretations are entitled to respect only to extent they are persuasive). Although they have not dealt with this specific issue, courts have stressed the relevance of RODs to various determinations under the statute of limitations. *See, e.g., Chromatex, Inc.,* 832 F.Supp. at 902–03 (finding statute of limitations for removal action began to run when ROD was filed); *United Nuclear Corp.,* 814 F.Supp. at 1561–62 (same). Although both operable units fell within the limitations period, the court in *United States v. Akzo Nobel Coatings, Inc.,* 990 F.Supp. 897 (E.D.Mich.1998), analyzed two operable units separately for purposes of the statute of limitations, *id.* at 905–07. The Court therefore finds that this administrative system indicates that the statute of limitations does not bar compensation for operable units qualifying under the limitation even if the plaintiff is barred from seeking compensation for earlier operable units.

The Court finds that the policy justifications advanced by the United States provide further support for the Court's interpretation of the statutory provision. The

gally applicable standards or "relevant and appropriate standards" "if the remedial action selected is only part of a total remedial action." CERCLA § 121(d)(4), 42 U.S.C. § 9621(d)(4). The NCP contains similar language. 40 C.F.R. § 300.430(f)(ii)(C) (2000).

United States asserts that, because of the complexity of Superfund sites, it is beneficial to divide response actions into different operable units and RODs because EPA is therefore able to move quickly to reduce health and environmental risks while continuing the process of studying other matters on the site. (Pl.'s Reply Br. at 13–14.) In the process of further investigations, EPA may discover more information and more liable parties justifying a further cost recovery action than was earlier believed when the first ROD was issued. (*Id.* at 15.) By permitting the United States to bring cost recovery actions based on the timing of each ROD and operable unit, the Court would be honoring CERCLA's two principal goals of facilitating the cleanup of potentially dangerous hazardous waste sites and requiring polluters to pay the costs of their pollution. *Cf. United States v. CDMG Realty Co.*, 96 F.3d 706, 717 (3d Cir.1996). In the end, we conclude that the promotion of these goals outweighs the concerns raised by Defendants, including

the argument that this construction would permit the United States to extend the period of liability indefinitely and hinder the congressional policies of finality and prompt cleanup of sites. (Defs.' Br. at 8; Mem. in Reply to Pl.'s Opp'n to Defs.' Cross Mot. for Summ. J. ("Defs.' Reply Br.") at 1–5.) [13]

In this instance, the undisputed facts indicate that OU2 and OU3 fall within the six-year limitations period for remedial actions. At the earliest, initiation of "physical on-site construction" of OU2 began with the construction of the security fencing along Spring Valley Road on January 15, 1991. (Porucznik Decl. ¶ 23.) The United States filed its Complaint on January 14, 1997. (No. 1 on the docket.) [14] OU2 therefore satisfied the six-year period for OU2. OU3 is still in the remedial design stage (Porucznik Decl. ¶ 26), and there is no evidence that any on-site construction has begun. Therefore, it clearly satisfies the statute of limitations. [15] De-

---

**13.** Defendants rely heavily on the supposedly plain language of the statute, the statute's authorization of a declaratory judgment action concerning future response costs, SARA's legislative history, and the Seventh Circuit's opinion in *United States v. Navistar Int'l Transp. Corp.*, 152 F.3d 702 (7th Cir.1998). The Court acknowledges that the legislative history of SARA contains statements emphasizing the importance of filing early cost recovery actions. For instance, the House Judiciary Committee stated that "in general these [cost recovery] actions should be brought as early as EPA has the necessary information to do so...." H.R.Rep. No. 99–253, at 20, *reprinted in* 1986 U.S.C.C.A.N. 3038, 3043. The House Energy and Commerce Committee also stated that the amendment "assure[s] that evidence concerning liability and response costs is fresh and to provide a measure of finality to affected responsible parties." H.R.Rep. No. 99–253, at 79, *reprinted in* 1986 U.S.C.C.A.N. 2835, 2861. The Court, however, concludes that this legislative history and the statutory provision itself do not alter its rejection of Defendants' contention that the

time bar for costs relating to OU1 applies to OU2 as well as OU3.

The Court further observes that the Seventh Circuit's decision in *Navistar* is distinguishable on the grounds that the Seventh Circuit did not deal with different operable units but instead held that a "subsequent action" under the statute can be brought only after an "initial action" has been brought against the same defendant. *Navistar Int'l Transp. Corp.*, 152 F.3d at 710.

**14.** The United States' reply brief states that its Complaint was filed on January 15, 1997. (Pl.'s Reply Br. at 24–25.) Because the docket clearly indicates that the Complaint was filed on January 14, 1997, the Court concludes that the reply brief is merely mistaken.

**15.** The Court notes that the categorization of particular items as remedial or removal in nature can be difficult. *See, e.g., California ex rel. Cal. Dep't of Toxic Substances v. Hyampom Lumber Co.*, 903 F.Supp., 1389, 1391–94 (E.D.Cal.1995) (discussing distinction between remedial item and removal item). The Court does not need to reach this issue because Defendants treat every item as a reme-

fendants make no arguments regarding when and how these two operable units commenced. Regarding the issue of the statute of limitations, the Court therefore grants the United States' motion for summary judgment and denies Defendants' cross-motion for summary judgment as moot concerning the statute of limitations and Affirmative Defense 7.

### B. *Divisibility*

Defendants contend that the United States' motion for summary judgment should be denied insofar as joint and several liability is inappropriate because the harm is divisible and reasonable bases exist to apportion this harm. (Defs.' Br. at 9.) Defendants arguably raise the issue of divisibility in Affirmative Defense 18, stating that "[t]he liability of the defendants as alleged is insignificant and none of the defendants disposed of hazardous waste at the site or caused the release of hazardous substances." (Answer Affirmative Defense 18.) In making this claim, Defendants assert they did not place any of the waste oil at the Site; that any "passive migration" is not a disposal for purposes of

CERCLA; that Defendants did not spread contamination on the Site because the landfill is not a part of the Site itself; that nothing Defendants did exacerbated or worsened the condition of the Site; that Defendants' conduct regarding the Lagoons actually was consistent with the cleanup activities undertaken in this case; that the movement of the contaminants on the Site did not increase the amount of contamination or spread the contamination to uncontaminated areas; that the Manzos own only a portion of the Site; that the creosote logs are not hazardous substances; and that the creosote logs were not released and did not pose a threat of release. (Defs.' Br. at 9–11.) Although Defendants' arguments may be less than compelling, the Court finds that sufficient genuine issues of material fact exist to justify the denial of the United States' summary judgment motion as well as Defendants' own cross-motion for summary judgment as to this component.

■ Although not a defense to liability, the doctrine of divisibility is "a judicially crafted allocation principle designed to remediate the harshness of joint and sev-

---

dial matter, thereby recoverable under the lengthier six-year statute of limitations for remedial actions. (Defs.' Reply Br. at 1.)

The United States also is not barred from recovering for the removal costs for ROD2 because the physical construction of ROD2 was commenced within three years of the conclusion of any removal action, thus permitting recovery for any removal costs in the remediation cost recovery claim. CERCLA § 113(g)(2)(B), 42 U.S.C. § 9613(g)(2)(B). Some courts have treated interdependent removal activities as a single removal action for purposes of the statute of limitations. *See, e.g., Kelley,* 17 F.3d at 844; *Akzo Nobel Coatings, Inc.,* 990 F.Supp. at 906–07; *United States v. Davis,* 882 F.Supp. 1217, 1225 (D.R.I.1995); *United Nuclear Corp.,* 814 F.Supp. at 1562. This removal action may continue until issuance of the ROD, *See, e.g., Chromatex, Inc.,* 832 F.Supp. at 902–03; *United Nuclear Corp.,* 814 F.Supp. at 1561–62

(same), or even the completion of the remedial design, *cf. Akzo Nobel Coatings, Inc.,* 990 F.Supp. at 907. EPA issued ROD2 on September 29, 1988 (Porucznik Decl. § 20), the construction of the fencing began on January 15, 1991 (*id.* § 20), the NJDEP contracted for the performance of the remedial design in August 1992 (*id.* § 23; ROD3 at 5), this design was completed in May 1994 (*id.* § 23; ROD3 at 5), and the actual removal of contaminated soil and construction of the sedimentation basin commenced on November 7, 1995 (Porucznik Decl. § 23). Any possible removal action is recoverable given that the removal design did not even commence until the construction of the fencing and the removal of soil and construction of the basin commenced within three years of the completion of the remedial design. Any removal actions related to ROD3 are recoverable given the absence of any apparent physical construction for ROD3 itself.

eral liability applied under CERCLA § 107(a) on those [potentially responsible parties] who have contributed a relatively lesser portion of hazardous substances to a CERCLA facility." *United States v. Rohm & Haas Co.,* 939 F.Supp. 1142, 1154 (D.N.J.1996). "[W]hen two or more joint tortfeasors acting independently cause a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the harm that the individual tortfeasor has caused." *Id.* at 1155 (quoting *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 268 (3d Cir.1992)). In order to seek apportionment under the doctrine, the defendant must prove that the harm is both divisible and capable of some reasonable apportionment. *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 268–69 (3d Cir.1992); *New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1121 (3d Cir.1997). Reasonable apportionment appears to require "some reasonable basis for determining the contribution of each cause to a single harm." *Alcan Aluminum Corp.,* 964 F.2d at 268–69. On summary judgment, the defendant "need only show that there are genuine issues of material fact regarding a reasonable basis for apportionment of liability." *Rohm & Haas Co.,* 939 F.Supp. at 1155 (quoting *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 721 (2d Cir.1993).)

█ The Court finds that Defendants have shown that genuine issues of material fact exist regarding divisibility. Such matters as the role of Eagle and Champion in placing contaminated waste oil, oily waste clay, and acid sludge at the Site are sufficient to create such issues. (*See, e.g.,* Defs.' Response ¶¶ 6, 16; Eckel Dep. at 3–17; Pl.'s Br. at 5.) The Court's conclusion is bolstered by the nature of the divisibility inquiry as a "factually complex one." *Rohm & Haas Co.,* 939 F.Supp. at 1155. Viewing the evidence in the light most favorable to the Defendants, the Court finds these matters sufficient to create genuine issues of material fact preventing summary judgment in the United States' favor. Similarly, the Court cannot grant summary judgment on the divisibility issue to Defendants when viewing the evidence in the United States' favor.

C. *The Entitlement of the United States to Seek Joint and Several Liability*

█ Defendants' Answer asserts the defense that "[t]he plaintiff, a generator of wastes disposed of at the Burnt Fly Bog site, is itself liable for response costs … and, consequently, is not a person entitled to recover response costs under the Act from any other person." (Answer Affirmative Defense 16.) Similarly, Affirmative Defense 2 states that "[s]ince agencies and departments of the United States are responsible parties, the cause of action is for contribution." (*Id.* ¶ 2.) Defendants contend that the United States is limited to a mere claim for contribution because it is supposedly a potentially responsible party under CERCLA (Def.'s Br. at 11–13.), apparently because of spills occurring during the cleanup process (12–23–81 Moncher Letter; 3–30–82 Moncher Letter; Burnt Fly Bog Site Report) and the supposed placement of oil obtained from the United States military on the Site. (Shelly Decl. Ex. E: Dep. of Martin Smith, Jr. dated 12–17–80 at 27, Ex. L: Response of Loeffel's Waste Oil Co. to Request for Information). Even assuming *arguendo* that the United States may be a potentially responsible party under CERCLA, the United States is still entitled to seek compensation for its response costs under prevailing case law, CERCLA's legislative history, and a policy analysis of the problem.

Courts have concluded that the United States is entitled to make a section 107(a)

cost recovery claim for "all costs of removal or remedial action incurred by the United States Government ... not inconsistent with the national contingency plan" even if the United States itself is potentially liable. *United States v. Kramer,* 757 F.Supp. 397, 414–15 (D.N.J.1991); *see also Sun Co. (R & M) v. Browning–Ferris, Inc.,* 124 F.3d 1187, 1193 (10th Cir.1997) ("A governmental entity (Federal, State or Indian) or a party who did not contribute to the waste may recover all of its expenditures in a traditional § 107(a) 'cost recovery' action against any [potentially responsible party]."); *United States v. Monsanto Co.,* 858 F.2d 160, 164 & n. 2, 173 & n. 28 (4th Cir.1988); *United States v. Hunter,* 70 F.Supp.2d 1100, 1108 (C.D.Cal.1999); *United States v. Wallace,* 961 F.Supp. 969, 974–75 (N.D.Tex.1996); *United States v. Taylor,* 909 F.Supp. 355, 363 n. 10 (M.D.N.C.1995); *United States v. Western Processing Co.,* 734 F.Supp. 930, 939–40 (W.D.Wash.1990). Defendants do not cite any case supporting their contention in contradiction to this case law.

Defendants, however, do rely on a confusing policy argument: permitting the United States to recover under section 107(a) somehow constitutes a misappropriation of funds because the United States should be responsible to replenish the Superfund resources used to pay for the cleanup out of its own general revenues. (Def.'s Br. at 12–13.) In essence, Defendants make an unsupported argument that the United States misappropriates funds when it uses Superfund revenues as opposed to general revenues to pay for cleanup expenses when it is a potentially responsible party. (*Id.*) The Court, however, rejects this argument because the policies of CERCLA are still served by permitting the United States, as a sovereign, to recover the costs of cleanup necessary to replenish the taxpayer-supported Superfund to enable it to undertake future cleanup actions. Any concern of misappropriation

or that the United States is treated differently than other potentially liable parties is significantly reduced by the availability of a contribution claim against the United States itself. *Cf. Kramer,* 757 F.Supp. at 414.

The legislative history of the SARA amendments to CERCLA also supports the Court's holding that the United States can bring an action for joint and several liability even if it is a potentially liable party itself. While discussing section 113(f) authorizing potentially responsible parties to seek contribution, the House Energy and Commerce Committee Report stated:

> This section [113] clarifies and confirms the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the clean-up or costs that may be greater than its equitable share under the circumstances. This section does not affect the right of the United States to maintain a cause of action for cost recovery under Section 107, or injunctive relief under Section 106, whether or not the U.S. was an owner or operator of a facility or a generator of waste at the site.

H.R.Rep. No. 99–253, at 80–81, *reprinted in* 1986 U.S.C.C.A.N. 2835, 2861–62. This committee report at least demonstrates that Congress did not intend section 113(f) to hinder the United States' ability to recover the costs of cleanup under section 107(a) of CERCLA.

■■■ The Court finally rejects Defendants' constitutional argument against this interpretation of CERCLA's provisions. Defendants claim that "[a] different treatment of the United States when it is a responsible party would constitute a violation of the Constitution's prohibition against unequal protection." (Def.'s Br. at

13.) The only legal authority cited by the Defendants is the Fourteenth Amendment (*id.*), which by its own terms only applies to states and not the United States. (U.S. Const. amend. XIV.) Applying the Fifth Amendment,[16] the Court finds that any different treatment is not unconstitutional, particularly given the absence of any citation to any authority on the part of the Defendants and the general rejection of constitutional challenges to CERCLA discussed below.

### D. *Defendants' Constitutional Defenses and the Retroactivity of CERCLA*

Defendants assert several affirmative defenses attacking the constitutionality of CERCLA. They appear to assert that the statute as enacted and applied generally violates the Constitution, specifically by exempting from liability hazardous substances and classes of persons without a rational basis (Answer Affirmative Defense 3), involves a taking without just compensation in violation of the Fifth Amendment of the United States Constitution and equivalent provisions of the New Jersey Constitution (*id.* Affirmative Defense 14), and CERCLA as amended is unconstitutionally vague and permits an unconstitutional delegation of legislative power (*id.* Affirmative Defense 15). Presumably pursuant to Affirmative Defense 3's general challenge to the constitutionality of CERCLA, Defendants apparently argue that CERCLA is not to be applied retroactively, and, if it is applied retroactively, the enactment is unconstitutional. (Defs.' Br. at 15–16; Defs.' Reply Br. at 5–6.) Because it finds that Defendants' constitutional challenges are without merit, the Court grants the United States' motion for summary judgment and denies Defen-

dants' cross-motion for summary judgment as to these defenses as moot.

Defendants' primary constitutional challenge to the application of CERCLA appears to be based on retroactivity. Defendants contend that any retroactive application of CERCLA would be unconstitutional under the Supreme Court's decision in *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), because Congress did not clearly indicate, after consideration of the costs and benefits of retroactive application, that it wished CERCLA to be applied retroactively. (Defs.' Br. at 15–16.) Given the alleged absence of this clear congressional intent, Defendants contend that the application of CERCLA in this case would be unconstitutional. (*Id.*)

Even assuming that all of the conduct relevant to Defendants' liability occurred before CERCLA's enactment, Defendants' argument must fail given the case law on this issue. The Court initially notes that *Landgraf* involved a question of statutory interpretation and not the "modest" constitutional restrictions on retroactive civil litigation. *Landgraf*, 511 U.S. at 272–80, 114 S.Ct. 1483; *see also, e.g., Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (applying rational basis standard to Fifth Amendment due process challenge to retroactive socioeconomic legislation). Courts traditionally have interpreted CERCLA as a retroactive enactment and have rejected constitutional challenges to this retroactivity. *See, e.g., United States v. Rohm & Haas Co.*, 939 F.Supp. 1142, 1152 (D.N.J.1996); *United States v. Kramer*, 757 F.Supp. 397, 429–31 (D.N.J.1991); *see also United States v. Monsanto Co.*, 858 F.2d 160, 174 (4th Cir.1988). This

**16.** The Fifth Amendment provides in relevant part that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law." (U.S. Const.amend. V.)

retroactive approach has continued after *Landgraf.* *See, e.g., United States v. Olin Corp.,* 107 F.3d 1506, 1511–15 (11th Cir. 1997); *In re Tutu Wells Contamination Litig.,* 994 F.Supp. 638, 660–61 (D.Vi.1998); *Raytheon Co. v. McGraw–Edison Co.,* 979 F.Supp. 858, 863–64 (E.D.Wis.1997); *Cont. Title Co. v. Peoples Gas Light & Coke, Co.,* 959 F.Supp. 893, 893–901 (N.D.Ill.1997); *Ninth Ave. Remedial Group v. Fiberbond Corp.,* 946 F.Supp. 651, 651–64 (N.D.Ind. 1996); *Nova Chems., Inc. v. GAF Corp.,* 945 F.Supp. 1098, 1100–05 (E.D.Tenn. 1996); *Gould Inc. v. A & M Battery & Tire Serv.,* 933 F.Supp. 431, 438 (M.D.Pa. 1996). Defendants cite one district court opinion refusing to apply CERCLA retroactively, *United States v. Olin Corp.,* 927 F.Supp. 1502, 1507–19 (S.D.Ala.1996), but the Eleventh Circuit reversed this ruling, concluding that CERCLA is a retroactive statute, *Olin Corp.,* 107 F.3d at 1511–15.[17] This Court follows the weight of case law and concludes that CERCLA applies retroactively and does not violate the Constitution through this application.

 Defendants' next major constitutional argument appears based on the takings clause of the Fifth Amendment, which Defendants treat as primarily an anti-retroactivity provision.[18] Defendants contend that the United States Supreme Court's decision in *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), supports its contention that retroactive application of CERCLA would be unconstitutional. This Court, however, joins other courts in concluding that the *Eastern Enterprises* decision does not alter the long-standing view that CERCLA does not violate the takings clause. *See, e.g., United States v. Alcan Aluminum Corp.,* 49 F.Supp.2d 96, 99–100 (N.D.N.Y. 1999); *United States v. Dico, Inc.,* 189 F.R.D. 536, 543–44 (S.D.Iowa 1999); *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.,* 61 F.Supp.2d 740, 741–45 (S.D.Ohio 1999); *Combined Props./Greenbriar Ltd. P'ship v. Morrow,* 58 F.Supp.2d 675, 676–80 (E.D.Va.1999); *United States v. Vertac Chem. Corp.,* 33 F.Supp.2d 769, 785 (W.D.Ark.1998).

With the exception of the above arguments and a reference to possible equal protection violations if the government is permitted to pursue these recovery claims even if it is a contributing party (Def.'s Br. at 13) considered above, Defendants do not specifically address any of their other asserted constitutional defenses in their briefs. Taking this absence into consideration, the Court finds that these other constitutional defenses must be rejected. Courts have found that various provisions of CERCLA do not fail the vagueness standard. *See, e.g., Carter–Jones Lumber Co. v. Dixie Distrib. Co.,* 166 F.3d 840, 846 (6th Cir.1999); *United States v. Alcan Aluminum Corp.,* 755 F.Supp. 531, 539 (N.D.N.Y.1991), *aff'd in part and rev'd in part on other grounds,* 990 F.2d 711 (2d Cir.1993). The unspecified "delegation of authority" challenge must also fail, particu-

**17.** The Court notes that the Eleventh Circuit also reversed the district court's holding that CERCLA was unconstitutionally applied because it exceeded Congress's Commerce Clause powers. *Olin Corp.,* 107 F.3d at 1509–11. This Court will not address any Commerce Clause issue because neither party has raised it.

**18.** The Fifth Amendment provides no "private property shall be taken for public use, without just compensation." (U.S. Const.amend.V.) Because of the Supremacy Clause of the Constitution, federal law cannot be invalidated on the grounds that it violates state constitutional provisions. (*Id.* art. VI, § 1, cl. 2.) The Court therefore will not consider Defendants' contention that CERCLA and its implementing regulations violate the New Jersey Constitution's takings provision, at least in the context of the United States' claims. (Defense 14.)

larly given the absence of any argument or relevant citations on the part of Defendants. *See, e.g., Olin Corp.*, 927 F.Supp. at 1520–21 (noting that delegation challenge to CERCLA must fail); *see also Alcan Alum. Corp.*, 755 F.Supp. at 539 (rejecting selective enforcement challenge). Finally, Defendants' objection to unspecified disparate treatment of certain hazardous substances and classes of individuals is rejected due to this general case law as well as the lack of specific details or other arguments in support of the defense. Given this law and the absence of any arguments to the contrary, the Court grants the United States' motion for summary judgment as to Defendants' constitutional defenses and denies Defendants' cross-motion for summary judgment as moot.

### E. The Innocent Landowner Defense

■■■ The Manzos invoke the innocent landowner defense, contained in their Answer as Affirmative Defense 1 (Answer Affirmative Defense 1), in an effort to avoid liability. They assert that all of the pollution was the responsibility of other parties and that Manzos' conduct was reasonable because waste oil and sludge had commonly been used to oil roads, it was not known to contain PCBs, EPA did not promulgate permissible levels of contaminants in the soil and water until after 1970, and they are not liable for mere passive migration. (Def.'s Br. at 14.) Defendants' argument fails because their assertions do not demonstrate that genuine issues of material fact exist as to this defense. The United States' motion therefore is granted and Defendants' cross-motion is denied as moot with respect to the innocent landowner defense.

Interpreting sections 101(35)(A) and 107(b)(3) of CERCLA, courts have established a list of elements a defendant must prove by a preponderance of the evidence to satisfy the innocent landowner defense:

1) Another party was the sole cause of the release of hazardous substances and the damages caused thereby; 2) The purchasing landowner did not actually know or have reason to know of the presence of the hazardous substance at the time of acquisition; 3) The purchasing landowner undertook appropriate inquiry at the time of acquisition, in order to minimize liability; and 4) The purchasing landowner exercised due care once the hazardous substance was discovered.

*Grand Street Artists v. General Elec. Co.*, 28 F.Supp.2d 291, 295 (D.N.J.1998); *See also United States v. CDMG Realty Co.*, 96 F.3d 706, 716 (3d Cir.1996).

■■■■ The Court concludes that no genuine issue of material fact exists on the application of the innocent landowner exception to justify a denial of the United States' motion for summary judgment. Dominick Manzo knew at the time of acquisition that the Lagoons contained waste oil and sludge from the operations of Eagle and Champion. (Defs.' Br. at 4–5; 1980 Dominick Manzo Dep. at 71–72.) Dominick Manzo also knew at the time of purchase that a sludge pile and drums were located on the Eagle parcel. (1980 Dominick Manzo Dep. at 71–72.) Dominick Manzo therefore cannot claim ignorance in the face of this evidence, even if he did not know that the materials contained hazardous substances at the time. *Cf. United States v. Mex. Feed & Seed Co.*, 980 F.2d 478, 484 (8th Cir.1992) (stating that transporter's lack of knowledge of hazardous nature of materials is immaterial). Even if Carmella Manzo was ignorant of the condition of the property at the time of purchase (1999 Carmella Manzo Dep. at 12–13), it still does not appear that the Manzos conducted a reasonable inquiry or acted with due care as required by the defense. After all, Ace–Manzo and Dominick Manzo performed such tasks as excavating and dispersing contaminated mate-

rial and moved drums containing waste. (1980 Dominick Manzo Dep. at 81–82, 127–30; Defs.' Br. at 5.) Such arguments as the fact that contaminated materials were moved off-site to the landfill parcel, that the actions were taken to stabilize the Lagoons, and that the movement of contaminants did not increase the amount of contamination or spread this contamination to uncontaminated areas are without merit. The Court therefore grants summary judgment to the United States on this defense and denies the cross-motion for summary judgment of Defendants as moot.[19]

### III. Monsanto's Motions to Dismiss and for Sanctions

As set forth in the Relevant Procedural History above, the State of New Jersey, on behalf of NJDEP, filed a state court action against Defendants to recover its response

---

**19.** Defendants assert a number of other affirmative defenses, specifically contributory and comparative negligence (Answer Affirmative Defense 5), failure to mitigate (*id.* Affirmative Defense 6), laches (*id.* Affirmative Defense 7), waiver (*id.* Affirmative Defense 10), estoppel (*id.* Affirmative Defense 11), failure to do equity (*id.* Affirmative Defense 12), and unclean hands (*Id.* Affirmative Defense 13). A CERCLA defendant, however, cannot assert the defenses of contributory and comparative negligence and failure to mitigate against the United States in this context. *See, e.g., Kramer,* 757 F.Supp. at 419 (no mitigation and no contributory negligence defenses). Although a split of authority exists on the equitable issues, *see, e.g., United States v. Marisol, Inc.,* 725 F.Supp. 833, 844–45 (M.D.Pa.1989) (noting existence of split of authority and refusing to strike equitable defenses on that basis), the Court finds that the other defenses listed above must also be dismissed because equitable defenses are unavailable to a CERCLA defendant in this context. *See, e.g., Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 88–90 (3d Cir.1988); *Kramer,* 757 F.Supp. at 427–28; *Rohm & Haas Co.,* 939 F.Supp. at 1152. Defendants' Affirmative Defense 8, claiming failure to join necessary and indispensable parties (Answer Affirmative Defense 8) also is rejected because the United States is not required to sue all potentially responsible parties. *Kramer,* 757 F.Supp. at 423–24. The defenses of noncompliance with the National Environmental Policy Act (Answer Affirmative Defense 9)and CERCLA itself (*id.* Affirmative Defense 17) also must be rejected. *Id.* at 420 ("[T]he liability provisions of CERCLA are independent of requirements in other provisions of CERCLA.... Thus, the alleged failure of the Government to comply with CERCLA or enforce environmental laws is not a defense to a section 107(a) recovery action.") Defendants' contentions in their Answer as to the level of response costs incurred and consistency with and approval under the NCP (Answer Affirmative Defense 17) are not relevant, according to at least some courts, to this liability stage of litigation. *Kramer,* 757 F.Supp. at 436; *United States v. Mottolo,* 695 F.Supp. 615, 630 (D.N.H.1988). In any case, Defendants fail to present any evidence why certain costs are inconsistent with the NCP. *See, e.g., Rohm & Haas Co.,* 939 F.Supp. at 1150 (noting that burden is on defendant to prove inconsistency with NCP). *But see Redwing Carriers v. Saraland Apartments,* 94 F.3d 1489, 1496 n. 8 (11th Cir.1996) (indicating split on whether plaintiff must demonstrate compliance with NCP at liability stage). Lack of causation and de minimis harm (Answer Affirmative Defense 18) are legally insufficient as defenses to CERCLA, a strict liability statute. *Id.* at 1152; *Kramer,* 757 F.Supp. at 419–23. In light of the absence of any express argument by Defendants regarding these defenses, the Court grants summary judgment to the United States on these affirmative defenses and denies Defendants' cross-motion for summary judgment as to these same affirmative defenses as moot.

The United States also contends that the failure to state a claim defense must be stricken as well because of the sufficiency of the United States' Complaint. (Pl.'s Br. at 34–35.) The Court observes that the United States' Complaint adequately alleges a *prima facie* case against Defendants for CERCLA cost recovery liability. (Compl.¶¶ 8, 31, 32, 33–38, 40.) Defendants fail to make any argument regarding this defense. The Court therefore grants the United States' motion to strike the failure to state a claim defense, and it denies Defendants' motion for summary judgment on this defense as moot.

costs at the Site pursuant to the Spill Act, 58 N.J. Stat. Ann. § 10–23.11 *et seq.* Defendants impleaded numerous third-party defendants in that action, including Monsanto, and that action was removed and consolidated with this case. Defendants' third-party Complaint seeks contribution and indemnification from Monsanto based on strict product liability and negligence for the manufacture and sale of PCBs. Monsanto has moved to dismiss Defendants' third-party Complaint as to it, arguing that the third-party Complaint is identical to the one Defendants attempted to file in response to the United States' action against Defendants pursuant to CERCLA, and therefore should be dismissed on the alternative grounds of claim preclusion, issue preclusion, or the same reasons the Court previously used to deny Defendants' prior motions for leave to amend their third-party Complaint against Monsanto. (*See* Mem. of Law of Monsanto in Supp. of Mot. to Dismiss Third–Party Pls.' Third-Party Compl. ("Monsanto's Br.") at 8–20.) In addition, Monsanto argues that the claims asserted against it in the third-party Complaint are frivolous and warrant the imposition of sanctions. . (*Id.* at 21–24.)

Defendants argue that their new third-party Complaint is not identical to the one they attempted to file previously and that it states a proper claim for contribution or indemnification against Monsanto based on strict liability and negligence. (Defs.' Br. in Resp. to Monsanto's Mot. to Dismiss ("Defs.' TP Br.") at 1–5.) In support of Defendants' argument, Defendants assert that (1) the Spill Act is broader than CERCLA; (2) even if Monsanto is not a responsible party under CERCLA, Monsanto is a responsible party under the Spill Act; and (3) as a responsible party under the Spill Act, Monsanto is jointly and severally liable as a joint tortfeasor. (*Id.*)

 As set forth in the Court's prior opinions and orders entered in this case, a common law cause of action for contribution or indemnification arises only when two or more persons become liable in tort to the same person for the same harm. (*See, e.g.,* Order Affirming 7–24–98 Mem. Op. of Hon. Freda L. Wolfson, U.S.M.J. filed 9–21–98 ("9–21–98 Order")) (citing *Lentz v. Mason,* 961 F.Supp. 709, 719 (D.N.J.1997), *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 685 F.Supp. 651, 657–58 (N.D.Ill.1988), *Nevada Power Co. v. Monsanto Co.,* 955 F.2d 1304, 1309 (9th Cir.1992).) The Court previously found that Defendants' prior proposed amendments to its third-party Complaint were futile as to contribution and indemnification claims against Monsanto because, as a matter of law, Monsanto had no liability for contamination of the property under CERCLA; thus, Monsanto and Defendants did not have a common liability to an injured party. (*See, e.g.,* Mem. Op. filed 9–21–98 at 6–10.) The only relevant difference between the two third-party Complaints is that the earlier proposed third-party Complaint sought contribution and indemnification for liability imposed pursuant to CERCLA, and the third-party Complaint filed in the State Court action seeks contribution and indemnification for liability imposed pursuant to the Spill Act.

Section 107(a) of CERCLA provides:

**(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date**

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

CERCLA § 107(a), 42 U.S.C. § 9607(a).

Section 44(c)(1) of the Spill Act, on the other hand, provides:

*Any person who* has discharged a hazardous substance, or *is in any way responsible for any hazardous substance,* shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the department or a local unit pursuant to subsection b. of section 7 of P.L. 1976, c. 141 (C.58:10–23.11f).

N.J. Stat. Ann. 58:10–23.11g(c)(1) (emphasis added).[20]

Defendants argue that, pursuant to the language of section 44 of the Spill Act that is underscored above, Monsanto is a person who is "in any way responsible for any hazardous substance" and, thus, is jointly liable with them for the costs of remediating the hazardous substances at the Site. (Defs.' TP Br. at 4.) Defendants' position must fail. As the Third Circuit stated in a situation similar to the one here,

However remote a party's responsibility under the Spill Act may be, the statute nevertheless requires some degree of particularity; one cannot be "responsible" for a hazardous substance without having some connection to the site on which that substance was deposited. In other words, like CERCLA, the Spill Act places a burden on [a party seeking contribution from another party] to show some connection or nexus between the [hazardous substance] at the sites in question and the [the other party].

*N.J. Tpk. Auth. v. PPG Indus., Inc.,* 197 F.3d 96 (3d Cir.1999) (holding that producers of chromite ore processing residue ("COPR"),[21] a substance designated as

**20.** *See also* N.J. Stat. Ann. § 58:10–23.11f(a)(2) (setting forth private right of contribution for cleanup costs against person "in any way responsible for a discharged substance who are liable for the cost of the cleanup").

**21.** COPR is a by-product of the refinement of chromium ore into metallic chromium components. *N.J. Tpk. Auth. v. PPG Indus., Inc.,* 16 F.Supp.2d 460, 464 (D.N.J.1998) The COPR allegedly produced was allegedly trans-

hazardous by EPA and NJDEP, could not be found contributory liable under CERCLA or Spill Act to owner of sites on which COPR had been deposited unless producers had some connection to sites). Thus, the Spill Act is not so broad as to impose liability on a producer of a hazardous substance merely because it produced the hazardous substance. *See N.J. Tpk. Auth. v. PPG Indus., Inc.*, 16 F.Supp.2d 460, 476 (D.N.J.1998).

As was the case when the Court refused to grant Defendants leave to file an amended complaint alleging claims for contribution or indemnification against Monsanto under CERCLA, Defendants have not alleged that Monsanto had any connection to the Site aside from the fact that it produced PCBs, a hazardous substance that was found at the Site. Defendants' allegations, therefore, fail to state a claim for contribution or indemnification against Monsanto under the Spill Act. Accordingly, the Court will grant Monsanto's motion to dismiss the claims asserted against it in Defendants' third-party Complaint. Because we believe that Defendants had a good faith argument for an extension of New Jersey law, however, we will deny Monsanto's motion for sanctions for filing an allegedly frivolous pleading.

### *CONCLUSION*

For the reasons expressed in this Memorandum Opinion, the Court grants in part and denies in part the United States' motion for partial summary judgment against Defendants, grants in part and denies as moot in part the United States' motion to strike certain affirmative defenses of Defendants, grants in part, denies in part, and denies as moot in part Defendants' cross-motion for summary judgment seeking the dismissal of the United States' Complaint, grants Monsanto's motion to dismiss the claims in the third-party Com-

plaint against Monsanto, and denies Monsanto's motion for sanctions against Defendants.

The United States' motion for partial summary judgment is granted as to the *prima facie* joint and several liability of Defendants for response costs incurred or to be incurred in connection with OU2 and OU3, subject to the successful assertion of a divisibility defense by the Defendants. It is also granted as to Defendants' Affirmative Defenses 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17. This includes summary judgment in favor of the United States as to CERCLA's constitutional retroactivity. The Court further grants the United States summary judgment as to Defendants' Affirmative Defense 18 insofar as it does not state a divisibility defense. The United States' motion is denied, however, as to Defendants' divisibility defense, possibly enunciated in Affirmative Defense 18. Because the Court considered all but one of Defendants' affirmative defenses in the summary judgment context, it denies the United States' motion to strike affirmative defenses as moot, except insofar as it grants the United States' motion to strike Affirmative Defense 4 (failure to state a claim).

Defendants' cross-motion for summary judgment is denied as moot as to their *prima facie* joint and several liability to the United States for response costs incurred or to be incurred in connection with OU2 and OU3 and as to Affirmative Defenses 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, and 17. This denial includes a denial of Defendants' retroactivity defense. Defendants' cross-motion is also denied as moot as to Affirmative Defense 18 insofar as this defense does not assert a divisibility defense. Defendants' motion is denied as to their divisibility defense.

---

ported to other locations and used as fill material in various construction projects. *Id.*

The Court grants Monsanto's motion to dismiss the claims in Defendants' third-party Complaint insofar as they are against Monsanto. The Court, however, denies Monsanto's motion for sanctions.

An appropriate Order accompanies this Memorandum Opinion.