**UNITED STATES of America,
et al., Plaintiffs,**

v.

**Dominick MANZO, et al.,
Defendants/Third-party
Plaintiffs,**

v.

**MONSANTO COMPANY, et al.,
Third-party Defendants.**

**Civil Action No. 97–289 (MLC).**

United States District Court,
D. New Jersey.

Aug. 1, 2003.

---

Kenneth G. Long, Esq. and Peter M. Flynn, Esq., Washington, D.C., for Plaintiff United States of America.

Lee W. Shelley, Esq., Manasquan, N.J., for Defendants Dominick Manzo, Carmella Manzo, and Ace Manzo, Inc.

## MEMORANDUM OPINION

COOPER, District Judge.

The United States ("the Government") brought this now-consolidated action under section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C.

§ 9607(a) to recover response costs in connection with the alleged release or threatened release of hazardous substances at the Burnt Fly Bog Superfund Site ("the Site").[1] (Compl.¶¶ 1, 7.) In a Memorandum Opinion filed December 29, 2000 ("the Liability Opinion") we held, *inter alia,* that (1) defendants Dominick and Carmella Manzo, who are husband and wife (collectively "the Manzos"), are liable parties as owners of a vessel or facility within the meaning of CERCLA; and (2) defendant Ace Manzo, Inc. ("Ace Manzo") is a liable party as a transporter within the meaning of CERCLA.[2] *United States v. Manzo,* 182 F.Supp.2d 385, 397–99 (D.N.J.2000).

The Court further held that genuine issues of fact existed as to whether the harm was divisible among the Manzo defendants and other individuals causing harm at the Site. *Id.* at 404–05. We held a bench trial from June 11 through 14 and 24 through 25, 2002 to decide this issue. (*See* Trs. dated 6–11–02, 10:34 a.m. ("1st Tr."), 6–11–02, 3:30 p.m. ("2d Tr."), 6–12–02 ("3d Tr."), 6–13–02 ("4th Tr."), 6–14–02 ("5th Tr."), 6–24–02 ("6th Tr."), & 6–25–02 ("7th Tr.").) Thereafter, the parties submitted post-hearing briefs and we conducted oral argument. For the following reasons, the Court concludes that the Manzo defendants have not proven divisibility and, therefore, are jointly and severally liable for the response costs sought by the Government.[3]

1. The Site is located on sixty acres of land in the Townships of Marlboro and Old Bridge, New Jersey. (Compl.¶ 1.)

2. We will refer to the Manzos and Ace Manzo collectively as "the Manzo defendants."

3. The Manzo defendants also argue in their post-trial brief for the Court to reconsider the exclusion of certain evidence at trial ("undocketed reconsideration request"). (Defs.'

## I. BACKGROUND: Legal Background; Factual Background; and Relevant Procedural History

### A. Legal Background

The Court has jurisdiction over this action. 28 U.S.C. §§ 1331, 1345; 42 U.S.C. §§ 9607(a), 9613(b). CERCLA authorizes the Government to undertake removal or remedial actions and then seek reimbursement from certain liable parties. 42 U.S.C. §§ 9604, 9607. Liable parties under CERCLA include:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance

Br. at 25–27.) However, they have not filed a motion for reconsideration. In any event, the Court has read the parties' submissions in support of and in opposition to the undocketed reconsideration request and held oral argument on June 27, 2003. For the reasons stated by the Court on the record on June 27, 2003, we would deny the undocketed reconsideration request even if a proper motion were filed.

*Id.* § 9607(a). Once a defendant is shown to be a liable party under this statute, the defendant is jointly and severally liable for all the Government's response costs, absent proof by the defendant of divisibility. *See, e.g., New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1121 (3d Cir.1997).

■■■ A defendant asserting divisibility must meet the difficult burden of proving either that (1) there are distinct harms; or (2) in the event of a single harm, "the harm is divisible and that the damages are capable of some reasonable apportionment." *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 270 (3d Cir.1992); *see Hatco Corp. v. W.R. Grace & Co.,* 836 F.Supp. 1049, 1087 (D.N.J.1993).[4] In other words, the defendant must prove that "there is a way to determine what portion of the harm (i.e. the hazardous substances present at the facility and the response costs incurred in dealing with them) is fairly attributable to the defendant as opposed to other responsible parties." *United States v. Rohm & Haas Co.,* 2 F.3d 1265, 1280 (3d Cir.1993). Equitable considerations, while potentially relevant in a contribution action by a defendant against other responsible parties, are not pertinent to the divisibility inquiry. *Id.* at 1280–81.

## B. Factual Background

The United States Environmental Protection Agency ("the EPA") and the New Jersey Department of Environmental Protection ("the NJDEP") conducted investigations of the Site, beginning in 1979. *Manzo,* 182 F.Supp.2d at 390. These investigations revealed hazardous substances including but not limited to polychlorinated bi-phenyls ("PCBs"), lead, methylene chloride, trichloroethylene, chloroform, and benzene. *Id.* The EPA and the State of New Jersey then entered into a cooperative agreement to coordinate response actions. *Id.* at 391. They divided the Site into different areas including the: (1) Uplands, (2) Northerly Wetlands, (3) Tar Patch,[5] (4) Westerly Wetlands, and (5) Downstream Area. *Id.*

Seven waste oil lagoons ("the Lagoons"), a filter-clay pile,[6] and over one hundred drums for waste storage were located on the Uplands. *Id.* at 389. (7th Tr., Video Dep. of Martin Smith ("Smith") at 147.) EPA and NJDEP investigations revealed extensive PCB and lead contamination in the Uplands, including the Lagoons. *Id.* at 391. The Northerly Wetlands, Tar Patch, Westerly Wetlands, and Downstream Area are down gradient from the Uplands; contamination in these areas has resulted, at least in part, from uncontrolled runoff and discharges from the Uplands. *Id.*

The EPA and NJDEP have divided the Site remediation into three separate operable units, "OU1," "OU2," and "OU3," each addressing a unique series of remedial actions.[7] *Id.* Separate records of decision,

---

4. The parties do not seem to dispute and we have found that the environmental damage at the Site constitutes a single harm. *See Hatco,* 836 F.Supp. at 1087 (distinct harms are "separate and independent"). (*See generally* Part II *infra.*)

5. The Contaminated Soil Area, which had originally been considered a separate area of the Site, is now understood to be part of the Tar Patch. *Manzo,* 182 F.Supp.2d at 391.

6. The EPA and NJDEP originally believed the filter-clay pile was an asphalt pile. *Manzo,* 182 F.Supp.2d at 391.

7. An operable unit is a:

   discrete action that comprises an incremental step toward comprehensively addressing site problems.... The cleanup of a site can be divided into a number of operable units depending on the complexity of the problems associated with the site. Operable

"ROD1," "ROD2," and "ROD3," document the EPA's selection of remedial actions for OU1, OU2, and OU3, respectively. *Id.*

The Manzos own three parcels of land on or near the Site, including the Uplands, Northerly Wetlands, and Tar Patch. *Id.* 389–90. The Manzo defendants operated a landfill ("the Manzos' landfill") on the Manzos' property just north of the Site. *Id.* at 389. The Manzos do not own the Westerly Wetlands or Downstream Area. *Id.* at 390.[8]

Dominick Manzo was aware of the filter-clay pile, the drums, and the Lagoons when the Manzos purchased the Uplands. *Id.* at 389. He also knew that the Lagoons contained waste oil and sludge, and that oil and tar were spilling out of some of the drums. *Id.* at 389–90. During the Manzos' ownership, Dominick Manzo and Ace Manzo engaged in earth-moving activities on the Site. *See* Part II.C *infra.*

### C. Relevant Procedural History

The Government filed this CERCLA action against, among others, the Manzo defendants on January 14, 1997. *Manzo,* 182 F.Supp.2d at 393. On April 1, 1997, the Manzo defendants filed cross claims and a third-party complaint for contribution against many other parties. *Id.* The Court bifurcated this action into separate liability and damages phases. *Id.* On April 12, 1999, the State of New Jersey, on behalf of the NJDEP, filed a separate action against the Manzo defendants in the Superior Court of New Jersey ("the state court action") to recover its response costs at the Site pursuant to the New Jersey Spill Compensation and Control Act, N.J.S.A. § 58:10–23.11. *Id.* On August 19, 1999, the state court action was removed to this Court and subsequently consolidated with this action. *Id.*

The Court previously held that the Government made out its *prima facie* case that the Manzo defendants are jointly and severally liable for response costs related to OU2 and OU3.[9] *Id.* at 396. However, we also determined that a bench trial was necessary to address the Manzo defendants' divisibility defense to joint and several liability.

## II. *FACTUAL FINDINGS:* Site Geography and Natural Drainage Patterns; Pre–Manzo Site Ownership and Activities; Manzo Site Ownership and Activities; and EPA and NJDEP Remediation

Most of the historical facts are undisputed. Such conflicts as arise in the evidence

---

units may address geographical portions of a site, specific site problems, or initial phases of an action, or may consist of any set of actions performed over time or any actions that are concurrent but located in different parts of a site.
40 C.F.R. § 300.5

8. In the Liability Opinion, we described the division of the Site into lots. The Manzos acquired (1) Lot 6A, on which the Tar Patch is primarily located, in 1963; (2) Lot 43, on which the Uplands is primarily located, in 1965; and (3) Lot 6, on which the Northerly Wetlands is primarily located, in 1968. (Gov. Exs.16A, 16B.) *Manzo,* 182 F.Supp.2d at 389–91. While we held that the Manzos' failure to own the entire Site (i.e. the Westerly Wetlands and Downstream Area) does not affect

their liability as owners, we also noted that this fact may be relevant to a divisibility argument. *Id.* at 398. We will address this argument in Part III.D *infra.*

9. The Government has incurred at least $8 million of response costs in connection with OU2 and OU3, including the costs it has paid the State of New Jersey through the cooperative agreement with the NJDEP. *Id.* at 393. The Government expects to incur significantly more costs in the future for OU3. *Id.*

The Government does not seek response costs in connection with OU1, because it admits that it is time-barred from doing so. *Manzo,* 182 F.Supp.2d at 399–400; *see* 42 U.S.C. § 9613(g)(2) (setting statutes of limitations for CERCLA actions).

are noted and resolved based upon our evaluation of credibility.[10] The ultimate issue of whether the harm to the environment is capable of apportionment is a question of law addressed in Part III *infra*. *See e.g. United States v. Hercules, Inc.*, 247 F.3d 706 (8th Cir.2001).

### A. Site Geography and Natural Drainage Patterns

The Northerly Wetlands, Tar Patch, Westerly Wetlands, and Downstream Area are all down-gradient of the Uplands, where the Lagoons, drums, and filter-clay pile are located. *Manzo*, 182 F.Supp.2d at 391–92. The Manzos' landfill, which is just north of the Site, is also down-gradient. *Id.* (Gov. Exs. 16A, 26A.) The Northerly Wetlands and Tar Patch are north of the Uplands, with the Tar Patch to the west of the Northerly Wetlands. (Gov. Ex. 62.) The Westerly Wetlands is west of the Uplands, Northerly Wetlands, and Tar Patch. (Gov. Exs. 16B, 19H, 62.) Finally, the Downstream Area is west of the Westerly Wetlands and adjoins the Burnt Fly Brook. (Gov. Ex. 19H.)

The drainage pattern on the Site naturally flows from the Uplands down-gradient to the Northerly Wetlands, Tar Patch, and Westerly Wetlands. (4th Tr., Testimony of Dennis Arthur Faherty ("Faherty") at 97; 2d Tr., Testimony of Peter Stokely ("Stokely") at 52.) In addition, liquid from the Northerly Wetlands naturally flows southwest through the Tar Patch and into the Westerly Wetlands. (*Id.* at 31; 5th Tr., Testimony of Anton Navarajah ("Navarajah") at 35; Gov. Ex. 62; 4th Tr., Faherty at 97.) It then flows west

through the Downstream Area and, ultimately, into the Burnt Fly Brook. (*Id.;* Gov. Ex. 59; 5th Tr., Navarajah at 35.) Because of these natural drainage patterns, contamination in one area of the Site has a potential impact on all other areas. (*Id.* at 84.)

### B. Pre–Manzo Site Ownership and Activities

Eagle Asphalt, Inc. ("Eagle") owned Lot 43, including the Uplands, from the early 1950s until approximately 1963. *Manzo*, 182 F.Supp.2d at 389. (Def. Ex. 34, Tr. of Martin Eckel Dep. dated 8–7–80 ("Eckel Dep.") at 6; Final Pretrial Order at § 3, ¶ 96.) During that time, Eagle and Champion Chemical Company, Inc. ("Champion") used the Uplands in connection with their oil-refining and road-oiling businesses, respectively.[11] (*Id.*)

Champion owns a factory about two miles from the Site in Morganville, New Jersey ("the plant"). (7th Tr., Smith at 134, 138.) Champion would receive from various companies waste motor oil mixed with water, which it would deposit in tanks. (*Id.* at 134; Gov. Ex. 68, Tr. of Martin Smith Dep. dated 12–22–80 ("Smith Dep.") at 19.) In the early 1950s, Champion would add caustic silicate and steam to the tanks to push the oil to the bottom before pumping it out. (*Id.;* 7th Tr., Smith at 134.) "Oil sludge" was a byproduct of this process. (Smith Dep. at 19.) In the middle to late 1950s, Champion began treating the waste oil with acid, thus forming "acid sludge" as a byproduct. (*Id.* at 18–19; 7th Tr., Smith at 175.)

**10.** At those points in this Memorandum Opinion where a stated fact relies on our resolution of a conflict in the testimony, we have generally made our credibility determination without discussion, but we have included references to both sides of the conflicting testimony.

**11.** Champion is a third-party defendant in this action. Any statements of fact contained in this Memorandum Opinion will not be binding upon Champion in this matter.

The byproducts of the refining business, including water mixed with traces of oil and caustic silicate ("waste water"), oil sludge, acid sludge, and filter clay, were then sent to the Uplands, where Champion created the Lagoons for disposal and storage.[12] (*Id.* at 139–41, 173–75.) The seven Lagoons lie adjacent to one another on the Uplands.[13] (1st Tr., Stokely at 134; Gov. Ex. 63.)

Lagoons 6 and 7 were built in the early 1950s and filled with waste water. (7th Tr., Smith at 139–40, 173.) The waste water first would be deposited in Lagoon 7 and the traces of oil would float to the top ("floating oil"). (*Id.* at 177–78.) A pipe connected Lagoon 7 to Lagoon 6 near the bottom, so that the floating oil would remain in Lagoon 7 while excess "water" would flow to Lagoon 6. (*Id.*) However, the "water" in Lagoons 6 and 7 always contained traces of oil and, therefore, continued to be waste water. (*Id.* at 178.) Lagoon 6 contained a pipe and a valve that could be opened when the waste water would reach a certain level. (*Id.* at 200.) When the valve was open, the waste water would flow through the pipe, into the ground, and down-gradient towards the Westerly Wetlands. (*Id.*)

Lagoon 1 was built around the same time as Lagoons 6 and 7 to hold oil sludge, which was then used for road oiling. (Smith Dep. at 19.) Lagoons 2, 3, 4, and 5 were built in the late 1950s and early 1960s

to hold acid sludge.[14] (7th Tr., Smith at 179–80, 182–85.) Used filter clay was deposited in a pile alongside Lagoons 1 through 5 and drums were placed near Lagoons 1 and 2. (*Id.* at 147, 152.)

The northern walls of Lagoons 6 and 7 broke at least once every year during Champion's and Eagle's operations at the Site, due to heavy rain. (*Id.* at 142, 149; 2d Tr., Stokely at 17–21.) As a result, waste water and possibly floating oil would overflow and spill into the down-gradient areas of the Site. (7th Tr., Smith at 142, 149, 200.) The spills were of varying magnitudes and would sometimes destroy vegetation. (*Id.*)

Champion employees, however, regularly maintained the Lagoons and repaired breaches to prevent unnecessary spilling. (Smith Dep. at at 52.) They also would skim oil off the top of Lagoon 7 to bring back to the plant for refining. (7th Tr., Smith at 176–78.) There is no evidence that Lagoons 1 through 5 broke or overflowed during Champion's and Eagle's operations at the Site. (*Id.* at 142, 149; Smith Dep. at 22, 56–57.) In addition, it does not appear that Champion and Eagle built roads or excavated on or near the Site. (7th Tr., Smith at 188.) Champion and Eagle discontinued their operations in or about 1963. (Final Pretrial Order at § 3, ¶ 7.)

The Lagoons were intact and filled with liquid as of 1963.[15] (Eckel Dep. at 17; 1st Tr., Stokely at 129, 138.) The ground just

---

**12.** Filter clay was used to clean the oil during the refining process. (Smith Dep. at 12.)

**13.** Government witness Peter Stokely identified the Lagoons as Lagoons 1 through 7 and labeled them on the Government's exhibit 63. Lagoons 1 through 6 are situated consecutively from east to west. (Gov. Ex. 63; 1st Tr., Stokely at 134.) Lagoon 7 is east of Lagoon 6, but north of Lagoons 4 and 5. (*Id.;* Gov. Ex. 63.) We adhere to this labeling system throughout this Memorandum Opinion.

**14.** The testimony is conflicting as to whether Lagoon 2 contained oil sludge or acid sludge. (*Compare* Smith Dep. at 16, *with* 7th Tr., Smith at 179–80, 182–85.) Because this distinction is not relevant to our determination of divisibility, we need not address it.

**15.** The Lagoons were all filled with a dark-toned liquid, and Lagoons 1 and 7 had a lighter-toned material floating on top of the dark-toned liquid, which, presumably, was floating oil. (1st Tr., Stokely at 129.)

north of Lagoons 6 and 7 was somewhat "scarred," in that soil was exposed and vegetation removed.[16] (*Id.* at 131–38.) There was also a moist area in the Westerly Wetlands. (2d Tr., Stokely at 5.) However, there was no evidence of erosion in the Lagoon area or human activity in the Tar Patch, which contained undisturbed shrub and forest land. (1st Tr., Stokely at 131–40.)

Martin Eckel ("Eckel") purchased Lot 43 from Eagle on November 13, 1964. (Eckel Dep. at 6.) Eckel did not touch the Lagoons during his ownership. (*Id* at 13.) In addition, the Lagoons did not overflow because the valve in Lagoon 6 remained open. (*Id.* at 19.)

The Manzos purchased Lot 43 from Eckel on July 1, 1965 and owned the Uplands, Northerly Wetlands, and Tar Patch by 1968. (*See* note 8 *supra;* Final Pretrial Order at § 3, ¶ 65.) The Lagoon walls remained intact and the valve in Lagoon 6 was open as of the Manzos' purchase. (Eckel Dep. at 17–19.)

## C. Manzo Site Ownership and Activities

### 1. *Uplands*

The landscape of the Uplands changed significantly by 1967. Ace Manzo and Dominick Manzo broke through and leveled Lagoons 2, 3, 4, and 7 after mixing their contents with sand and gravel ("oily mixed material"). (2d Tr., Stokely at 20; Final Pretrial Order at § 3, ¶ 22.) *Manzo,* 182 F.Supp.2d at 390. They then used some of the oily mixed material to build roads from the Uplands through the Tar Patch to the Manzos' landfill. *Id.* (Final Pretrial Order at § 3, ¶ 22; Gov. Ex. 62; 2d Tr., Stokely at 6, 22–25.) They also used some of the oily mixed material as cover on top of the Manzos' landfill. *Manzo,* 182 F.Supp.2d at 390.

Lagoons 1, 5, and 6 by 1967 contained significantly less liquid than in 1963. (2d Tr., Stokely at 6–7, 35.) Lagoon 6 was breached on the north side at some point between the Manzos' purchase of Lot 43 and 1967. (*Id.* at 8–9; Gov. Ex. 62.) Trails of oily liquid flowed from this breach towards the Northerly Wetlands and Tar Patch. (*Id.;* 2d Tr., Stokely at 8–9.) [17]

Erosion pathways carried contaminated liquid and sediment from the Lagoons and former Lagoons to other parts of the Site, from the late 1960s through the early

---

**16.** The ground scarring appears to have been the result of vehicle trails or equipment scraping over the ground. (1st Tr., Stokely at 140.)

**17.** An August 23, 1966 article from the Red Bank Area Daily Register reported:

Oil was deposited in the [Lagoons] several years ago when a local processing company went out of business. Until recently, it remained static within clay walls. However, visitors ... have reported recently that wide openings have been cut in sides of the pools by Mr. Manzo's equipment to allow the murky, much diluted oil to seep out and spread over a wide area.

(Gov.Ex.46.) The Manzo defendants argue that this article was discredited by Edna Netter, a real estate broker who testified before the Marlboro Township Board of Adjustment that spills occurred before the Manzo defendants' ownership and activities. (Defs.' Br. at 17–19; Def. Ex. 33 at 26–28.) However, this testimony does not contradict that spills also occurred during the Manzo defendants' ownership and activities, which we find is supported by the weight of the evidence. (*See* Part II.C *supra & infra.*) They also argue that they left the valve in Lagoon 6 open during their ownership and activities and, therefore, the Lagoons did not overflow. However, they have provided no evidence supporting this proposition. Moreover, Dominick Manzo admits that he observed liquid escaping from the breach in Lagoon 6 but made no attempt to repair it. *Manzo,* 182 F.Supp.2d at 390.

1980s.[18] (*Id.* at 17, 37, 45; Gov. Exs. 33, 46, 62; 4th Tr., Faherty at 81, 103; 4th Tr., Testimony of William M. Hartman ("Hartman") at 9–10.) Two such pathways extended from the breach in Lagoon 6. (Gov.Ex.62.) Others followed alongside the roads created by Ace Manzo and Dominick Manzo. (*Id.;* 2d Tr., Stokely at 14–17.)

Lagoon 1, by the late 1970s and early 1980s, contained oil sludge on the bottom, waste water, and floating oil.[19] (4th Tr., Hartman at 9–10; 4th Tr., Faherty at 68–69.) As a result of rainwater build-up, the liquid in Lagoon 1 was overflowing towards the Northerly Wetlands. (*Id.* at 68–69, 91; 4th Tr., Hartman at 9–10; 6th Tr., Testimony of Lester Jargowski ("Jargowski") at 96; 7th Tr., Testimony of David Mark Kaplan ("Kaplan") at 10.) Contaminated tar-like material, which might have been oil sludge, also was present around the edges of Lagoon 1. (4th Tr., Faherty at 69.) Moreover, the edges of Lagoons 1, 5, and 6 were heavily oil-stained. (*Id.* at 101, 114.)

The area of destroyed Lagoons 2 through 4, by the late 1970s and early 1980s, continued to contain acid sludge. (*Id.* at 78–83.) Tar-like material was "oozing" through the backfill in the area of Lagoon 2. (*Id.* at 91; Gov. Ex. 11 at 1.0–2, 36; 5th Tr., Navarajah at 61.) The area of Lagoon 3 was covered by an approximately four-inch layer of black, oily, sludge-like material. (7th Tr., Kaplan at 23; 4th Tr., Faherty at 79–80.) The area of Lagoon 4 consisted of a layer of black, heavily-contaminated, soil-type material on top of a layer of sludge mixed with contaminated soil. (*Id.* at 81, 83, 101.) The destruction of Lagoons 3 and 4 caused "much of their black oily contents to discharge over many acres of the low-lying portions of the site." (Gov. Ex. 11 at 1.0–2; 5th Tr., Navarajah at 61; 7th Tr., Kaplan at 24.) Moreover, sediments from the area of destroyed Lagoons 2 through 4 migrated into the Tar Patch through erosion pathways. (2d Tr., Stokely at 18–19, 38–39, 40, 56.)

Ace Manzo and Dominick Manzo moved and possibly punctured some of the drums during the excavation of the Lagoons. *Manzo,* 182 F.Supp.2d at 390. In addition, the drums were exposed to wind and rain, causing their hazardous contents to leak into the ground. (Final Pretrial Order at § 3, ¶¶ 81–82.) By the late 1970s and early 1980s, many drums were crushed and buried, and "dark, oil tar-like deposits [were] infiltrating the soils below the drum areas." (4th Tr., Hartman at 11–15; Gov. Ex. 5 at 100071; *see* Gov. Ex. 38; 4th Tr., Faherty at 84–85, 105.)[20]

18. The Manzo defendants claim that before Eagle sold Lot 43 to Eckel, the floating oil had been pumped out of the Lagoons. (Defs.' Br. at 13.) Therefore, they contend that the escaping liquid was solely water with negligible traces of contaminants. (*Id.*) While one study indicated that the waste water in Lagoon 1 was relatively free of contamination, the same study stated that the Lagoons also contained contaminated sludge and floating oil. (Gov. Ex. 11 at 3.0–3 through 3.0–20.) Moreover, the weight of the evidence indicates that the Lagoons and the areas of the destroyed Lagoons contained contaminated oil sludge, acid sludge, waste water, and floating oil, from 1963 through the 1980s. (*See* Part II.C.1 *supra* & *infra.*)

19. Faherty described the oil sludge at this point as not pure oil, but "grossly contaminated petroleum hydrocarbon sludge, that black waste oil odor. Tar-like." (4th Tr., Faherty at 73.)

20. EPA contractors may have caused some of the drums to be turned over. (4th Tr., Faherty at 136–138.) However, the Manzo defendants have presented no conclusive evidence as to who was primarily responsible for turning over the drums, or causing them to decay or leak into the ground. Moreover, they admit that the drums were exposed to the elements during their ownership and activities. (Final Pretrial Order at § 3, ¶¶ 81–82.)

### 2. *Northerly Wetlands*

Vegetative mortality occurred in the Northerly Wetlands after 1963 as a result of contaminated liquid and sediments migrating from the Uplands. (5th Tr., Navarajah at 65; Gov. Exs. 11 at 3.0–43, 61; 2d Tr., Stokely at 32, 49.)[21] By the late 1970s and early 1980s, liquid from the Uplands carried a petroleum sheen into the Northerly Wetlands and standing water was apparent. (*Id.* at 49; 4th Tr., Faherty at 105; Gov. Exs. 38, 61.)

Investigations in the 1990s revealed significant lead and PCB contamination in the Northerly Wetlands. (Gov. Ex. 15 at 10; 5th Tr., Navarajah at 88–89.) By this time, the Northerly Wetlands was surrounded by thick vegetation but devoid of vegetation where contamination was found. (*Id.* at 33.) In addition, oily material was present on the soil's surface throughout the area. (*Id.*)

### 3. *Tar Patch*

The Tar Patch, by 1967, was marked by sediment deposits, oil staining, and signs of soil moisture, as a result of (1) Ace Manzo's and Dominick Manzo's construction of roads through the area using the oily mixed material; and (2) contaminated liquid and sediments migrating from the Uplands and Northerly Wetlands. (2d Tr., Stokely at 18–19, 38–39, 40, 56.) Vegetative mortality resulted and continued until the Tar Patch was devoid of vegetation. (5th Tr., Navarajah at 34, 58–59; Gov. Ex. 11 at 3.0–43; 4th Tr., Faherty at 94.)

Dark patches of a tar-like material would rise to the surface and spread over the Tar Patch, particularly during the summer months. (*Id.;* 5th Tr., Navarajah at 34.) This phenomenon is not naturally occurring; rather, the source of the tar-like material is likely oil sludge or acid sludge from the Lagoons. (4th Tr., Faherty at 111; 7th Tr., Kaplan at 16.) At high temperatures, a petroleum odor would emanate from the soil. (5th Tr., Navarajah at 34.) Moreover, investigations in the 1990s revealed significant lead and PCB contamination in the Tar Patch. (*Id.* at 88–89; Gov. Ex. 15 at 10.)

### 4. *Westerly Wetlands*

Ace Manzo and Dominick Manzo built a graded dirt road from the Manzos' landfill through the Westerly Wetlands. (Gov. Ex. 62; 2d Tr., Stokely at 25–26.) As a result of this construction as well as contaminated liquid and sediments migrating

---

**21.** The Manzo defendants contend that vegetative mortality did not result from contaminated liquid and sediments migrating from Uplands. According to one study, the vegetative mortality was more likely due to "upgradient erosion and water-born transportation of materials loosened and disturbed by sand mining activities" than "oil or other substance spillage." (Gov. Ex. 5 at 100065; *see* 4th Tr., Hartman at 33–34.) Another expert stated that changes in water level can result in vegetative mortality. (2d Tr., Stokely at 83–84.) However, the evidence establishes that oil and other contaminated materials did spill and migrate throughout the Site, and the Manzo defendants have presented no evidence indicating that these materials did not contribute to or primarily cause the vegetative mortality. Moreover, one study indicated:

Two separate activities seem responsible for the elimination of these plant communities. The downslope dike of the lagoons failed, releasing solids and liquids that flowed to the drainage that bisects the Study Area. The second activity causing a serious alteration of site vegetation occurred on the northern portion of the Study Area and may have been related to a landfill operation east of the hill [the Manzo landfill]. It appears that surface soils were removed over large areas of this hillside and used as a cover on adjacent lowlands to the east. The result was an increased acreage of upland substrates denuded of vegetation at the expense of forested wetlands or deciduous forests.

(Gov. Ex. 11 at 3.0–43; *See* 5th Tr., Navarajah at 58–59.)

from the Uplands, Northerly Wetlands and Tar Patch, the Westerly Wetlands became progressively wetter and less vegetated between 1963 and the early 1980s. (*Id.* at 26–27, 51–52; 4th Tr., Faherty at 102; Gov. Exs. 11 at 3.0–43, 13; 5th Tr., Navarajah at 58–59, 76.)[22] Moreover, investigations in the 1990s revealed significant lead and PCB contamination in the Westerly Wetlands. (*Id.* at 88–89; Gov. Ex. 15 at 10.)

### 5. Downstream Area

The soil in the downstream area was infected with oil by the early 1980s. (4th Tr., Hartman at 12.)[23] Moreover, high concentrations of PCBs and lead were discovered in the sediments in this area. (5th Tr., Navarajah at 73.)

### 6. General Site Conditions

Contaminated sediment was found throughout the Site. (Gov. Ex. 11 at 1.0–9; 5th Tr., Navarajah at 104.) While natural "attenuation" and "bio-degradation" have caused some contaminants to be "leached away" from surface waters, significant contamination has remained on the Site throughout the time periods at issue. (*Id.* at 104, 114, 117, 122–23; Gov. Ex. 11 at

1.0–9, 3.0–34.) Similarly, re-vegetation has occurred in some areas as organic-matter formation has provided a barrier between contamination and the land's surface; however, contamination has remained in the soil below the vegetation and organic matter. (6th Tr., Navarajah at 30.) Moreover, this contamination primarily originated in the Uplands and migrated throughout the Site through erosion pathways created during the Manzos' ownership and, at least in part, through Ace Manzo's and Dominick Manzo's earth-moving activities. (Gov. Ex. 11 at 1–2; 5th Tr., Navarajah at 58–59; *see generally* Part II.C *supra*.)[24] In addition, an "oil-like chemical odor" has existed throughout the Site, requiring inspectors to wear respirators during their visits. (4th Tr., Faherty at 92; 4th Tr., Hartman at 16; Gov. Ex. 36; 6th Tr., Jargowski at 64.)

### D. EPA and NJDEP Remediation

Remediation of the Site began with OU1, which solely addressed the Uplands. *Manzo*, 182 F.Supp.2d at 391–92. The Lagoons were remediated in different ways depending on their contents. For example, Lagoon 1 was remediated by first pumping out rainwater. (4th Tr., Faherty at 70–72.) The water was treated at the

---

**22.** One report noted that considerable disturbance to the Westerly Wetlands resulted from "manmade and natural erosion." (Gov. Ex. 13 at 1–2; 5th Tr., Navarajah at 76.)

**23.** When a sample of soil from the Downstream area was placed in a glass of water, an oil sheen came to the surface. (4th Tr., Hartman at 12.)

**24.** According to one report:

The conditions at the Burnt Fly bog site have been a major cause of concern to the public and government for many years.... Site defoliation and/or past earth moving activities [at the Site] have caused severe erosion to occur, resulting in the movement of significant amounts of site soils from the upland areas toward the lower-lying areas.... [P]reliminary samplings and chemical analy-

ses indicated the presence of several toxic substances, including PCBs in site soils, waters and waste....

Chemical analyses which were performed on the collected samples indicate that lagoon wastes, in many cases, have migrated to other lowlying [sic] areas of the site, due to overtopping or breaching of the lagoon dikes. The composition of the sampled wastes, for the most part, included many EPA-listed Priority Pollutants, both organic and inorganic, including PCBs. The presence of these wastes, together with erosion that has occurred at the site due to man's activities, account for the site distress which is currently observed.

(Gov. Ex. 11 at 1–2; *see* 5th Tr., Navarajah at 58–59.)

Site, placed in storage containers, and then shipped to a disposal facility. (*Id.* at 72.) The oil sludge at the bottom of Lagoon 1, after being sampled for PCBs, was stabilized with one part "kiln dust" and one part "quick lime" per every ten parts of oil sludge. (*Id.* at 74.)[25] The stabilized material was then excavated and taken to disposal facilities for treatment. (*Id.* at 75–76.) Lagoon 4, on the other hand, did not contain any water; the contents simply were stabilized with surrounding soil and excavated. (*Id.* at 83.) In addition, drainage ditches and a pipe were installed between Lagoon 1 and a road to the north of Lagoon 1 to collect rainwater and drain it towards the Northerly Wetlands. (*Id.* at 158–60.) EPA and NJDEP contractors also maintained the Lagoon walls to prevent continued overflow. (*Id.* at 76–77.)

Most of the drums were relocated to a "staging" area after being sampled for contaminants. (*Id.* at 85–86.) Their contents then were poured into an excavated, plastic-lined area in the ground and mixed with sand to achieve a soil-like state suitable for landfilling. (*Id.* at 85–86.) The filter-clay pile also was excavated, and more drums were discovered and disposed of at that time. (*Id.* at 86–87.)

OU2 and OU3 addressed the Northerly Wetlands, Tar Patch, Westerly Wetlands, and Downstream Area. (Gov. Exs. 16A, 16B; 5th Tr., Navarajah at 27–29.) Remediation focused mainly on removing PCB and lead contamination, which had the effect of eliminating the other types of contaminants. (*Id.* at 38.)

ROD2 required, *inter alia*, the (1) removal of approximately 6,000 cubic yards of contaminated soil found in the Downstream Area; and (2) construction of a sedimentation basin in the Downstream Area to prevent contaminated sediment from flowing into the Burnt Fly Brook. (*Id.* at 29, 40–41, 47–48; Gov. Ex. 19H.) ROD3 included, *inter alia*, (1) excavation and removal of approximately 25,000 cubic yards of contaminated soil from the Tar Patch and Northerly Wetlands; (2) restoration of clean soil and vegetation in the Tar Patch and Northerly Wetlands; (3) sampling of surface water and sediment in the sedimentation basin and Burnt Fly Brook; and (4) biological sampling in the Westerly Wetlands. (*Id.* at 42–44.)

### III. *CONCLUSIONS OF LAW*: Zero Percent Apportionment Theory; One–Eleventh Share Apportionment Theory; Volumetric Apportionment Theory; and Geographic Apportionment Theory[26]

The Manzo defendants advance four separate theories in support of their divisibility defense: (1) they are not responsible for any of the harm at the Site ("zero percent apportionment theory"); (2) at most, one-eleventh of the harm is attributable to them ("one-eleventh apportionment theory"); (3) the harm can be divided on the basis of the volume of floating oil remaining in the Lagoons when the Manzos first purchased Lot 43 ("volumetric apportionment theory"); and (4) they are not liable for any of the harm to the Westerly Wetlands and Downstream Area ("geographic apportionment theory").

### A. Zero Percent Apportionment Theory

■■■ Defendants can prove divisibility by establishing that none of the hazardous

---

**25.** Kiln dust is "like a by-product of cement." (4th Tr., Faherty at 74.) Quick lime was used to take the moisture out of the oil sludge. (*Id.*)

**26.** To the extent that the "Conclusions of Law" portion of this Memorandum Opinion contains findings of fact in addition to those expressly set out in Part II *supra*, they shall be deemed to be part of the factual findings.

substances found at a site are fairly attributable to them. *See Rohm & Haas,* 2 F.3d at 1280. In support of their zero percent apportionment theory, the Manzo defendants argue that Site contamination has actually been reduced during and since their ownership and activities because (1) they engaged in similar efforts as the EPA and NJDEP to remediate the Site; (2) as a result, only water escaped from the Lagoons during this time; and (3) natural attenuation and bio-degradation have decreased and continue to decrease the contamination at the Site. These three propositions are not supported by the evidence.

The Manzo defendants did not engage in similar remedial efforts as the EPA and NJDEP. Ace Manzo and Dominick Manzo backfilled the Lagoons and claim to have left the valve open in Lagoon 6 to drain liquid towards the Westerly Wetlands. EPA and NJDEP remediators, on the other hand, have engaged in extensive remedial actions, including but not limited to (1) sampling for contamination; (2) excavating each Lagoon in different ways depending on their particular contents; (3) maintaining the Lagoon walls to prevent continued overflow; (4) constructing a sedimentation basin in the Downstream Area to prevent contaminated sediment from flowing into the Burnt Fly Brook; and (5) excavating and removing contaminated soil throughout the Site. (*See* Part II.D *supra.*)

The Manzo defendants' contention that only water escaped from the Lagoons during their ownership and activities also is not supported by the evidence. (*See* notes 17–18 *supra* and accompanying text.) In support of this theory, they seem to rely on evidence indicating that contamination was spread (1) when Champion and Eagle were on the Site; and (2) during the EPA and NJDEP remediation. (Defs.' Br. at 2–9, 20.) However, the spread of contamination during these periods does not disprove that contamination also spread during their ownership and activities. *See Rohm & Haas,* 2 F.3d at 1280 (no apportionment where defendant merely asserted most hazardous substances attributable to others). Moreover, the evidence indicates that Champion and Eagle as well as EPA and NJDEP contractors, unlike the Manzo defendants, sought to keep the Lagoons intact in order to prevent unnecessary spills. (*Compare* Parts II.B and II.D *supra, with* note 17 *supra.*)[27]

The Manzo defendants have presented evidence that natural attenuation and bio-degradation may have reduced contamination on certain parts of the Site. Other evidence, however, indicates that such processes only covered contaminants but did not eliminate them. *See* Part II.C.6 *supra.* In any event, even if such processes did reduce contamination, we find that this does not provide a basis for apportionment. The Manzo defendants have not demonstrated that the contaminants eliminated through natural processes were attributable to them as opposed to other responsible parties. They also have not shown that the contamination level at the Site would not be less but for their neglect and earth-moving activities. On the contrary, one would presume that natural processes would first reduce contamination produced or spread by earlier actors, i.e. Champion and Eagle.[28] Accordingly, the

---

**27.** Even assuming the remaining liquid in the Lagoons was mostly water by the time of the Manzos' ownership, that does not lessen the Manzo defendants' liability. "CERCLA liability does not depend on the existence of a threshold quantity of a hazardous substance."

*Alcan,* 964 F.2d at 260 (rejecting that defendant could not have contributed to environmental injury because hazardous substances in waste below naturally-occurring level).

**28.** The fact that the EPA and NJDEP considered a "no action" alternative for remediating

zero percent apportionment theory must fail.

## B. One–Eleventh Share Apportionment Theory

■ The Manzo defendants, in support of their one-eleventh share apportionment theory, compare (1) evidence that Lagoons 6 and 7 overflowed at least once a year during the activities of Champion and Eagle; with (2) one spill reported by the Red Bank Area Daily Register on August 23, 1966 during their ownership and activities ("8–23–66 spill"). (Defs.' Br. at 19.) We do not adopt this theory because it ignores evidence that (1) contaminated liquid and sediments from the Uplands were constantly migrating throughout the Site along erosion pathways and roads, from the late 1960s through the early 1980s; (2) Ace Manzo and Dominick Manzo may have physically transported contaminated material into the Tar Patch through their earth-moving activities; and (3) contaminated material also leaked from the drums and filter-clay pile. (*See* Part II.C *supra.*) In addition, the Manzo defendants have presented no evidence that the volumes of contaminants migrating during each Chemical–Eagle spill and the 8–23–66 spill were equal. Accordingly, the one-eleventh share apportionment theory must fail.

## C. Volumetric Apportionment Theory

■ Courts have held that single harms can be divided on a volumetric basis where two or more defendants conducted similar activities to produce the same contaminants. *See, e.g., In re Bell Petroleum Servs.,* 3 F.3d 889 (5th Cir.1993) (court

accepted volumetric apportionment where defendants engaged in similar chrome-plating activity and expert testimony supported calculations); *Hatco,* 836 F.Supp. at 1087–88 (harm divisible based on time of use where defendants' activities similar, time periods known, and two experts endorsed method). However, because a method for apportionment can be neither "theoretical nor arbitrary," volumetric apportionment is not possible where there is insufficient evidence to determine the volume of waste each defendant contributed. *Id.; Bell,* 3 F.3d at 903. It also is inappropriate where independent factors, such as relative toxicity, migratory potential, or synergistic capacities of hazardous substances, might have had a substantial effect on the harm to the environment. *United States v. Monsanto Co.,* 858 F.2d 160, 177 & ns. 26–27 (4th Cir.1988).

The Manzo defendants argue that a volumetric ratio of contamination attributable to them can be determined by comparing the weight of lead contamination escaping from the Lagoons during their ownership and activities with the total weight of lead contamination found in the Northerly Wetlands, Tar Patch, Westerly Wetlands, and Downstream Area. (Defs.' Br. at 25–33.) They contend that the first figure can be determined using the following information: (1) the area of the Lagoons; (2) the volume of floating oil that escaped from the Lagoons during their ownership and activities; and (3) the concentration of lead in that floating oil. (*Id.*) The Manzo defendants have relied on (1) a March 1, 1983 EPA-contractor report ("Dames and Moore Report") which indicates an absence of PCBs and a lead concentration of

---

the Westerly Wetlands does not contradict this conclusion. (*See* 5th Tr., Navarajah at 121–22.) Before the EPA and NJDEP select a remedy, several remedial investigations are conducted and a feasibility study is performed where various remedial alternatives are identified and evaluated. (*Id.* at 38.) In addition,

a public meeting is held and comments are obtained regarding the proposed plan. (*Id.*) The EPA then issues a record of decision documenting the selected remedy. (*Id.*) In light of this extensive review process, we will not question the ultimate selection of a remedy.

1300 milligrams per liter in the floating oil of Lagoon 1; (2) the Dames and Moore Report calculation of 98,300 square feet for the area of Lagoons 2 through 4;[29] and (3) their "concession" that four inches of floating oil escaped from the Lagoons during the period of their ownership and activities. (*Id.*; Gov. Ex. 11.)

■ The volumetric apportionment theory contains at least six flaws. First, the Manzo defendants presented no admissible evidence supporting the area measurements of the Lagoons other than the area measurements for Lagoons 2 through 4 in the Dames and Moore report. (*See* note 3, 29 *supra* and accompanying text.) Second, the theory relies on the contaminant concentration in the floating oil of Lagoon 1 as of March 1, 1983 and seems to assume that this concentration was the same (1) throughout the Manzo defendants' ownership and activities; and (2) for other Lagoons containing floating oil (i.e., Lagoon 7). (*See, e.g.,* note 15 *supra* and accompanying text.) Third, it does not appear that the Government agrees with their "concession" that four inches of floating oil escaped from the Lagoons during their ownership and activities. (Gov.'s Br. at 35–38.) Fourth, the Manzo defendants presented no admissible expert testimony supporting the theory's internal coherence. Fifth, even if the theory was shown to be internally coherent, it fails to account for the contaminated (1) waste water which spread throughout the Site through the breach in Lagoon 6, the pipe in Lagoon 6, and the various erosion pathways; (2) oil sludge and acid sludge at the bottom of the Lagoons which seems to have spread to other parts of the Site through erosion pathways as well as Ace Manzo's and Dominick Manzo's earth-moving activities; and (3) contents of the drums and filter-clay pile which leaked into the ground. (*See* Part II.C *supra.*)

The final flaw relates to the fact that only Ace Manzo and Dominick Manzo destroyed Lagoons 2, 3, 4, and 7, causing the oil sludge and acid sludge to rise to the surface. (*See* Part II.C.1 *supra.*) Similarly, only they spread the oily mixed material to other parts of the Site. (*See id.*) Accordingly, any contamination resulting from the spread of oil sludge or acid sludge is solely attributable to them, not Champion and Eagle. The Manzo defendants, however, have presented no evidence regarding the relative toxicity or migratory potential of the oil sludge and acid sludge versus the floating oil and waste water.

The Manzo defendants, therefore, did not (1) present evidence to enable the Court to divide the harm on a volumetric basis; or (2) account for independent factors such as relative toxicity and migratory potential. Accordingly, the volumetric apportionment theory must fail.

## D. Geographic Apportionment Theory

■ The Manzo defendants argue that the harm is divisible on a geographic basis,

---

**29.** The Dames and Moore Report refers only to Lagoons 1 through 4. The parties have stipulated that in the Government's exhibit 26A "Lagoon 1" refers to Lagoon 1, "Lagoon 2" refers to Lagoons 2 through 4, "Lagoon 3" refers to Lagoon 5, and "Lagoon 4" refers to Lagoon 6. (Gov.Ex.67.) We assume the same terminology applies in the Dames and Moore Report. In support of the area of the Lagoons they cite a section of the report entitled "Lagoon 2," which states: "Historical aerial photographs indicate that the area located between Lagoon 1 and Lagoon 3 was at one time occupied by a series of lagoons ... This area was estimated at 98,300 square feet." (Gov. Ex. 11 at 3.0–6; Defs.' Br. at 26.) The Manzo defendants contend that this figure is similar to figures supplied by their experts. However, we excluded the testimony of those experts and will not reconsider that ruling. (*See* note 3 *supra.*)

because the Manzos did not own the Westerly Wetlands and Downstream Area. (Defs.' Br. at 34.) That the Manzos own only a portion of the Site alone is insufficient to establish that the harm is capable of apportionment. *See Rohm & Haas,* 2 F.3d at 1280. However, the geographic apportionment theory does not end there. The Manzo defendants also argue that each operable unit is a separate "site." They further claim that the Manzos are not actually owners of the "OU2 site," which they contend is comprised of the Westerly Wetlands and Downstream Area. (Defs.' Br. at 34.) They rest this argument on our holding in the Liability Opinion that a separate statute of limitations applies to each separate operable unit. (*Id.*) *See Manzo,* 182 F.Supp.2d at 399–404.

■ We are unpersuaded by this reasoning. In the Liability Opinion, we held that the statute of limitations had not run on OU2 and OU3 although it had run on OU1. *Id.* This conclusion did not hinge on a determination that each separate operable unit is a separate site. Rather, we based our statute-of-limitations holding on (1) the central role of operable units in the administrative CERCLA framework; and (2) the policy that the Government should be able to move quickly to reduce health and environmental risks while continuing investigation at a site which might ultimately lead to subsequent recovery actions. *Id.*

An operable unit is "a discrete action that comprises an incremental step toward comprehensively addressing site problems." 40 C.F.R. § 300.5. It is not a site, although it "may address geographical portions of a site." *Id.* Moreover, the operable units in this case do not solely address geographical portions of the Site. *Manzo,* 182 F.Supp.2d at 391–393. Rather, OU2 involved a study on treatment

alternatives for the Northerly Wetlands and Tar Patch in addition to remedial efforts in the Westerly Wetlands and Downstream Area. *Id.* at 392. Similarly, OU3 included remediation in the Northerly Wetlands, Tar Patch, Westerly Wetlands, and Downstream Area. *Id.* at 392–93.

The geographic apportionment method also does not address Dominick Manzo's and Ace Manzo's liability as transporters. We have found that their earth-moving activities, combined with the natural drainage patterns at the Site, contributed to the spread of contaminants throughout the Site. (*See* Part II.C *infra.*) Accordingly, the Manzo defendants' geographic apportionment theory must fail.

## IV. CONCLUSION

For the reasons stated, the Court concludes that the Manzo defendants have not met their burden of proving that the harm at the Site is divisible and that the damages are capable of some reasonable apportionment. Accordingly, we hold that the Manzo defendants are jointly and severally liable for the Government's response costs associated with OU2 and OU3. An appropriate order accompanies this Memorandum Opinion.